# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JERRY W. EASTERLING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:14-cv-02353-JEO** |
| | ) | |
| **FORD MOTOR COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT FORD'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT DONALD R. PHILLIPS, P.E.

Plaintiff Jerry W. Easterling, by and through his undersigned counsel, files his Opposition to Defendant Ford Motor Company's Motion to Exclude the Opinions of Plaintiff's Expert, Donald R. Phillips, P.E. and in support thereof states as follows:

## INTRODUCTION

In the early morning of December 30, 2012, Mr. Easterling set out for work and was traveling from his home to his job in McCalla along Morgan Road in Jefferson County, when his vehicle suddenly struck a patch of ice, causing Easterling to lose control of his 2003 Ford F-250 pickup truck. *See* Easterling Depo, Ex. 1 at 45, 82, 83, 87[1]; *see also* Alabama Uniform Traffic Accident Report, Defense Ex. A.

---

[1] Plaintiff has submitted one set of Exhibits for both this Opposition brief and his Response to Defendant's Motion for Summary Judgment.  Thus, the reference to exhibit numbers is the same exhibit for both of Plaintiff's submissions.

The crash was serious and resulted in life threatening injuries to Easterling. According to Ford's own retained accident reconstructionist, Easterling's vehicle rotated significantly during the crash sequence, hit a wall of mountain rock and rolled approximately 2 ¾ times before finally coming to rest on the driver's side. *See* Excerpts from Deposition of Todd Hoover ("Hoover Depo"), attached as Exhibit 6, at pp. 7, 21-22, 217; *see also* Easterling Depo, Ex. 1 at p. 98. Easterling's memory of the crash sequence is understandably limited, but he recalls that when the vehicle came to a stop, his "butt" was on the driver's side window, his head was pinned between the front seat and the steering wheel, his legs were twisted and his seatbelt was unbuckled, with the webbing twisted around his left arm. *See* Easterling Depo, Ex. 1 at pp.88-89, 106.

Easterling is a habitual seatbelt user, and he wore his seatbelt regularly while operating his 2003 F-250, facts supported by physical evidence uncovered by Ford's seatbelt expert, Eddie Ray Cooper, who acknowledged that Easterling's seatbelt restraint system showed signs of typical and consistent use. *See* Easterling Depo, Ex. 1 at p. 94; *see also* Deposition of Eddie Ray Cooper ("Cooper Depo"), Exhibit 7, at pp. 77, 85. Easterling, as was his practice, was appropriately wearing his seatbelt on December 30, 2012 when the Ford vehicle struck ice, and sometime during the crash, the seatbelt unintentionally and inadvertently unbuckled. *See* Easterling Depo, Ex. 1 at pp. 45, 89, 106.

Paramedics from Regional Paramedical Services responded to the scene of the crash, extracting Easterling from his vehicle and transporting him to UAB Medical Center. *See* Ex. A to Defendant's Motion for Summary Judgment; *see also* Deposition of Nathan Dunaway ("Dunaway Depo"), attached hereto as Exhibit 8, at p. 25. At the scene of the crash, after sustaining a literal constellation of significant and life threatening injuries as will be outlined below, Easterling told Dunaway, and Dunaway recorded in the EMS record, that Easterling "states his seatbelt was on but broke". *See* Dunaway Depo, Ex. 8 at pp.20, 23-24; *see also* EMT report, Ex. 15.

The injuries sustained by Easterling in this violent rollover crash were serious and life threatening. They are indicated to be

1)   Comminuted bilateral scapular fractures;
2)   Bilateral rib fractures, ribs 2-7;
3)   Bilateral lung contusions;
4)   Bilateral hemothorax;
5)   A T6 spinous process fracture;
6)   An anterior mediastinal hematoma;
7)   Bilateral C2 transverse process fractures;
8)   Vertebral body fractures, C6/C7;
9)   A possible temporal bone fracture; and
10)  A right 5th metacarpal fracture.

*See* Ponce Depo, Ex. 2 at pp. 8-15.

Dr. Brent Ponce[2], one of Easterling's treating orthopedic surgeons testified that each of Easterling's injuries were caused by the crash and that the scapular fractures in

---

[2] Dr. Ponce, did his residency and shoulder fellowship at Harvard University Medical School, was a flight surgeon in the Air Force for five and a half years and is Associate Professor and Director of Orthopedic Research Fellowship at University of Alabama-Birmingham. He is Board Certified in Orthopedic Surgery and President of the Alabama

particular were produced by great force applied to those anatomical structures.  *See* Ponce Depo, Ex. 2 at pp. 25, 51, 63.  Dr. Ponce, a UAB orthopedic surgeon who specializes in shoulder injuries, noted that it is rare in his experience to see a patient with two (2) scapular fractures.  *See* Ponce Depo, Ex. 2 at pp. 5, 63.  However, not only did Dr. Ponce opine that these injuries are rare and were produced by great force, he also opined that it is rare for a patient to survive such injuries.  *See* Ponce Depo, Ex. 2 at pp. 63, 70.  In fact, according to Dr. Ponce, when Easterling entered his care, he was "really sick" and was "fortunate to survive," given the significance of his injuries, Ponce Depo, Ex. 2 at pp. 30.

Dr. Ponce further testified that, although Easterling's shoulder fractures eventually healed, they healed in a "non-anatomic position" that altered the normal mechanics of his shoulders, meaning that Easterling cannot lift his arms above his shoulders without pain and a limitation on his ability to do overhead activity.  *See* Ponce Depo, Ex. 2 at pp. 35-36, 46.  Dr. Ponce is also of the opinion that surgery will not fix this problem and Easterling's pain will continue.  *See* Ponce Depo, Ex. 2 at pp. 37.  Understanding Easterling's physical limitations, Dr. Ponce found Easterling's efforts to work within his limitations to be "admirable."  Ponce Depo, Ex. 2 at pp. 72-73.

---

Orthopedic Society, as well as responsible for authorship of over 50 publications, including books related to orthopedics.

Moreover, Dr. Debora Marth, Ford's own biomechanics/injury causation expert opined that if Easterling had his seatbelt latched during the entire crash sequence, he "[a]bsolutely" would not have experienced either this pattern of injuries or level of injuries.  Marth Depo, Ex. 3 at pg. 66.  In other words, Ford does not dispute that Easterling's injuries are inextricably linked, both in their nature and severity, to the seatbelt being unlatched; instead, Ford predictably argues that Easterling was unbelted before the crash began.  Marth Depo, Ex. 3 at pp. 23-24.

## HISTORY OF THE RNS4G SEATBELT BUCKLE

Ford, as you would expect from most auto manufacturers, have in place certain overall standards regarding the automobiles it sells to the public.  One of those dealing specifically with the seatbelt buckle is that it "shall be designed to prevent false latching…".   Ford Worldwide Product Standard for Occupant Restraining Device, section 5.7, attached as Exhibit 16.  In other words, a buckle should not appear to be latched to the user/consumer via the "click" sound and indication the buckle is holding the inserted latch plate, but in fact there is not a proper latching of the buckle which during a crash, will not perform its function of restraining the occupant in the seat.

The buckle at issue in this case, referred to as the RNS4G was developed and manufactured by TRW and provided to Ford to place in as many as 18 different model vehicles throughout its product line since approximately 2001 and is even

being used in some models as last as model year 2016.  Ford's Response to Plaintiff's

First Request for Production, Ex. 17, Response to Request for Production No. 8.

The general components of the buckle are shown as follows:



McSWAIN ENGINEERING, INC.

| PROJECT: | Easterling v. Ford Motor Company |
|---|---|

Subject-Type Exemplar Ford Seat Belt Buckle Assembly



Latch Plate and Buckle Assembly



Latch Plate Inserted in Buckle Assembly

ENCLOSURE 2

In July of 2001 TRW, in conjunction with Ford recalled the RNS4G buckle

because the buckle may not fully latch and therefore not provide the necessary

restraint in an accident. This is referred to as Safety Recall 01S21.   In the letter Ford

sent to owners of vehicles that had the RNS4G buckle, Ford made sure to warn the

owners in bold type, among other things, of the key indicator that the buckle may

not be fully latching: **"If the seat belt buckle does not return to its full up position,**

**the buckle may not be fully latched.  As soon as possible, please go to the dealership so they can inspect your vehicle."**  Ford Letter to Owner, Ex. 18.[3]

Even more telling, when Ford first learned of this concern of belts coming inadvertently unlatched, on May 25, 2001 it sent out an email to its affected plants instructing them to stop shipping vehicles until the buckle was checked as prescribed in the email.  The plants were advised in this email that this was a "stop ship due to seat belt tongue not staying engaged in belt buckle."  The plants were further instructed to check all the affected RNS4G buckles by first noting the position of the red button to the black housing of the buckle and is should be "slightly proud" to the housing.  Then the tongue was to be placed into the buckle slowly.

> If the red button does not spring back to its original position, proud to the housing, the tongue should be easily removable from the buckle by wiggling the tongue back and forth laterally…while trying to pull it out of the buckle.  **If it does pull out or the red button has not returned to its original position, you have a defective assembly.**

Ford Letter to Plants, May 25, 2001, Ex. 19 (emphasis added).[4] Although based on the documents and information provided by Ford on this Recall, there is no clear indication that this problem was occurring due to fractured button return springs as we have with the case *sub judice,* and it is agreed that the buckle at issue was not

---

[3] This is not anything Mr. Easterling would have received as his buckle was not part of the 01S21 Recall.

[4] To address the recall, Ford with TRW created a "tool" for dealers to use that was developed to identify 100% of the defective buckles, but probably also catch buckles that are not problematic.  Attached as Exhibit 20 is the documentation that went to the Ford Dealers regarding this Recall.  The letter to dealers acknowledges again the concern of buttons not returning fully to home indicating the buckle is not fully latched.  It also includes information provided to dealers regarding how to use the "tool" in order to confirm if the buckle was defective.

one subject to the recall as it was manufactured after what Ford refers to as the "clean date" (which is between July 2001 and December 2001) or the date when the problems leading to the Recall had been fixed by TRW, what is significant to this case is the recognition that a button not returning to its home position leads to an unstable latching condition and one which may result in a "defective assembly" as acknowledged by Ford in its own documents.  As of the recall, Ford was clearly aware that a latched buckle which has a button not "fully proud" and returned to its full home position is indicative that a component within the buckle is failing to ensure the latch plate is properly locked in the buckle.

Approximately one year after the recall was started, in June 2002, further concerns were raised internally at Ford regarding the "clean" or post-recall revised RNS4G buckles.  This was prompted by a tick up in warranty claims with 250 claims that these "clean" buckles were having "engagement" issues.  Seven of these assemblies were checked using the "tool" from the Recall and passed, but a "partial latch condition" could be created if the buckle was latched with "a heavy bias toward the release button."  It was decided that TRW would do a check of all the buckles returned through warranty for engagement problems.  The internal investigation was ultimately closed with no further action pursued after TRW removed all the returned buckle covers and checked the internals of the buckles and determined either the buckles worked fine with the "tool" or they were "contaminated" or were "physically

damaged" causing them not to work properly.    2002 Internal Investigation Documents, Ex. 21.

The concerns about the RNS4G did not end there.  Approximately 1 ½ years later, in January 2004, Ford's group known as Enhanced Vehicle Concerns (ECI) reported that customers on certain 2002 Crown Victoria/Grand Marquis/Town Car vehicles were claiming the buckles were unbuckling while driving.  Again, this was the post-recall revised RNS4G buckle.   The initial documentation from ECI indicated "[t]he alleged failure mode was described as an issue with the red release button possible not returning to its full up position when the seat belt tongue is inserted into the latch."  Again, TRW was provided buckles that were returned from warranty for claims of unlatching and evaluated a total of 34 of these buckles that had been manufactured after the recalled buckles i.e. "clean" buckles.  Out of these 34 buckles, 15 either unlatched intermittently" or "no latch" when the "tool", now referred to as the "Recall Test Gauge" was used with the buckles.  Thus, using Ford's standard from the original recall, these buckles failed the test.  However, even though almost half of these buckles "failed" the test used to recall buckles and pull them from the public as "defective parts" as part of the Recall, Ford again closed this investigation indicating "a safety related defect has not been identified."  2004 Internal Investigation Documents, Ex. 22.

There is one last piece of the history of the RNS4G buckle that has only come to light with the recent production of documents by TRW.  One of the most significant documents produced by TRW is its DFMEA (Design Failure and Effects Analysis) for the RNS4G buckle.  This is where TRW, as the designer and manufacturer of the buckle, addresses what potential failure modes can happen to the buckle and what can happen if that failure occurs .   According to TRW one of the functions of the buckle is that the "pushbutton must remain in full out position".  The potential failure mode that can occur is "the pushbutton does not remain in the full out position".  TRW indicates that the potential effects of this type of failure are "occupant not restrained", "no latch", "partial latch", "non-conformance to Federal spec" and "non- conformance to customer spec".  The final piece of this analysis is that TRW identifies the potential cause for such a failure of the pushbutton not remaining in the full out position is the "latch guide leaf springs have inadequate force to return pushbutton to full out position when latched." The latch guide leaf springs would be what we understand to be the button return springs which are the springs that are part of the latch guide.  See DFMEA Bates TAAI-8601, attached as Ex. 11[5].

---

[5] This document, as well as several others have been filed "under seal" with the District Court Clerk's Office as they include "confidential information" produced by either Ford or TRW.  Those documents are indicated with a Exhibit Sheet that indicates "Filed Under Seal."

First, there is no doubt that fractured button return springs which are not returning the pushbutton to "full out" position qualify as providing "inadequate force" to the return pushbutton.  Next, TRW clearly recognizes in this document that such fractured springs which are no longer returning the pushbutton to "full out" position can result in a seat belt that does not restrain the occupant.  Moreover, TRW acknowledges that such a failure constitutes not only a failure to meet the Federal Motor Vehicle Safety Standards, but fails to conform to the customer's (here TRW's customer is Ford who is purchasing the buckles from TRW) specifications.  It is with this backdrop of information about the RNS4G that the Plaintiff addresses the Motion to Preclude Donald Phillips, P.E.'s testimony regarding the unreasonably dangerous nature of the RNS4G buckle in Mr. Easterling's vehicle on the morning he was so seriously injured.

## ARGUMENT

### A. RELEVANT CASE LAW

As Defendant has indicated, *Daubert* and its progeny, as well as Rule 702 breaks into a three-part inquiry: (1) is the expert witness qualified to testify regarding the matters addressed; (2) is the methodology the expert used to reach his opinion sufficiently reliable; and (3) will the testimony assist the trier of fact to understand the evidence.  *Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011).  Defendant points out some of the things the Court can look at in addressing

reliability. However, as has been pointed out by many courts over the years, this list is not exclusive and does not necessarily apply to all experts in every case, and whether these specific factors apply in a particular case is up to the trial judge to determine. *United States v. Brown,* 415 F.3d 1257, 1267-68 (11th Cir. 1999).

On the issue of qualifications, the standard to qualify as an expert witness is liberal one. *Thomas v. Evenflo Co., Inc.*, No. CV-02-2001-VEH, 2005 U.S. Dist. LEXIS 46512, at *16 (N.D. Ala. Aug. 11, 2005). Thus, a trial court should not exclude expert testimony because the witness lacks expertise in a specialized area directly related to issues in the case, "if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question." *Id.* at *17. Further, a lack of personal experience with the product will not disqualify the expert if he is qualified on some other factor as set forth in Rule 702, such as "knowledge, skill, experience, training, or education". *Adams v. Hooper*, No. 7:12-cv-1942-LSC, 2013 U.S. Dist. LEXIS 153251, at *9 (N.D. Ala. Oct. 25, 2013) (citing *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013)).

> A lack of specialization should generally go to the weight of the evidence rather than its admissibility and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' *Daubert*, 509 U.S. at 596. Thus, 'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight.' *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991).

*Wen Chyu Liu*, 716 F.2d at 168-69.

In addressing whether the expert used a reliable methodology and reliably applied that methodology to the facts, Rule 702

> …mandates a determination of whether the expert had sufficient evidence (evidence which itself may or may not be admissible) to support his or her testimony, not a determination of whether that testimony standing alone provided sufficient evidence to allow a reasonable fact-finder to find for the plaintiff on an issue of substantive law.

*Rudd v. GMC,* 127 F. Supp. 2d 1330, 1336-37 (M.D. Ala. 2001).  The courts have acknowledged that the *Daubert* factors should not be used to preclude an expert's testimony such as an engineer/mechanical engineer, which is not based on scientific theory, but experience and practice.  *McGee v. Evenflo Co.*, No. 5:02-CV-259-4, 2003 U.S. Dist. LEXIS 25039, at *10-11 (M.D. Ga. Dec. 11, 2003); *Cornerstone Missionary Baptist Church v. Se. Mut. Church Ins. Co.*, No. 5:12-CV-149, 2013 U.S. Dist. LEXIS 177627, at *12 (M.D. Ga. December 18, 2013).  Their methodologies "more often involves some inquiry into industry standards, practices, or publications and results in conclusions based upon concrete data, testing, measurements, or calculations.  *Id.* at *12.

The last prong of the inquiry on admissibility of expert testimony is whether the testimony will assist the trier of fact or what has come to be an inquiry into whether the expert's testimony is relevant.  *Henderson v. Goodyear Dunlop Tires N. Am.,*

*LTD.,* 2013 U.S. Dist. LEXIS 151550, 2013 WL 5729377 (M.D. Ala. Oct. 22, 2013). "Assisting the trier of fact means that 'the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.'" *Id.* at *6 (citing *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir. 1992)).

The Advisory Committee Notes to Rule 702 confirms that rejection of expert testimony is the exception and not the rule. "*Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'. *United States v. Acres of Land Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996)." *Fed. R. Evid. 702,* Advisory Committee Notes-2000 Amendment. Indeed, some courts have commented on the over use and as some see it, abuse of the *Daubert* challenge to expert testimony. A Chief Federal District Judge out of the Middle District of Georgia recently addressed these concerns in the case of *Bullock v. Volkswagen Grp. of Am., Inc.*, No. 4:13-CV-37, 2015 U.S. Dist. LEXIS 61174 (M.D. Ga. May 11, 2015).

> Much of the *Daubert*-related skepticism of expert testimony arises in part from an apparent concern that ordinary citizens are incapable of evaluating the credibility of some types of opinion evidence. Thus, we have anointed the omniscient judge as the gatekeeper to determine the opinions a jury should or should not hear. The gatekeeper role originated over concerns about "junk science," but some have expanded it to decide cases on the merits based on an assessment that the expert's opinion is not credible. Allowing such credibility assessments to lock the gate to the jury box removes decisions traditionally best left to the common sense and varied life experiences of a properly instructed jury.

*Id.* at *3-4.

## B. DONALD PHILLIPS, P.E. IS QUALIFIED TO GIVE HIS OPINIONS IN THIS CASE

When it comes down to it, this is a case about a seat belt buckle which failed to operate properly during a serious accident.  The issues to be addressed by an expert is did the subject seat belt unintentionally become unlatched during this collision and if so, what caused it to unlatch.  If it is determined that the belt did in fact come unlatched unintentionally in this accident, the expert must address whether the cause for the belt unlatching was a defect, which under Alabama law and the AEMLD "a defect is that which renders a product 'unreasonably dangerous' i.e. not fit for its intended purpose."  *Rudd v. GMC,* 127 F.Supp. 2d 1330, 1333 (M.D. Ala. 2001)(citing *Casrell v. Altec Industries, Inc.,* 335 So.2d 128, 133 (Ala. 1976)).  Thus, the expert must have the qualifications to address the operation of a seat belt and its components, including the buckle, in a crash and determine if the one at issue was unreasonable dangerous or not fit for its intended purpose.

In addressing the qualifications issue, the Defendant, as it does throughout its argument regarding the testimony of Phillips, sets up "strawmen" assertions such as Phillips is not a materials expert and does not know the material which makes up the latch guide springs which were broken in this buckle.  However, to address the issues pertinent to the inquiry of whether Phillips is qualified to address the operation of a

seat belt and its buckle during a crash, these issues do not need to be addressed.  For purposes of being able to address whether this buckle was fit for its intended purpose, it is not necessary to be able to address how strong the springs are and when and why they broke.[6]  Defendant asks these questions, but fails to make any justification why this information would be necessary for Phillips to know to reach the opinions he has made in this case.  In fact, these same "strawman" type questions could be asked of Ford's "seat belt" expert, Cooper who has no experience in materials and does not hold himself out to be an expert in materials.  In fact, in reviewing Cooper's expert report, it is clear he has no opinions regarding the material used for these springs, how they broke or when they broke.  Cooper Expert Report, Ex. 23.  His opinions, consistent with Phillips, address whether the seat belt was being worn by Mr. Easterling at the time of the wreck and if the fractured return springs constituted a defect by allowing the belt to come unlatched during a collision.  Ford's expert did not need to know the intricacies of materials to answer these questions, but as far as Ford is concerned Phillips needs to meet a higher standard to address these same issues.

Regarding Phillips qualifications to address the unreasonably dangerous condition of the subject seat belt buckle, as set forth in the Affidavit of Phillips

---

[6] No dispute has been raised in this case by any of Defendant's experts that the fractured button return springs did not exist on the morning of this accident when Mr. Easterling left his home.

provided with this Opposition, Mr. Phillips has had his B.S. in Mechanical Engineering since 1984. He is a licensed P.E. in 7 states, including Alabama. From 1986-1990 he was employed at Breed Automotive, a major manufacturer of seat belts and air bags. His job included serving as a liaison with the automotive industry in design, development and testing of frontal airbag systems, including the interaction with seat belts in a crash. As part of this position, he analyzed nearly 1000 car to car crash tests and many more sled test. This work was performed for customers of Breed such as Ford, GM, Hyundai and Jaguar. Phillips Affidavit, Ex. 4, ¶¶ 3-6.

For the past 27 years he has been a consulting automotive engineer and in this position, has analyzed over 500 motor vehicle accidents, with at least 400 of these involving seat belt inspection and/or analysis, as well as reviewed and evaluated thousands more crash and sled tests. Since 1997 he has been qualified as an expert and testified as such in approximately 27 trials which involved claims of seat belt defects, evidence of occupant interaction with a seat belt and/or seat belt performance issues. Four of these trial experiences took place here in Alabama. He also sets out in his Affidavit and its attachments additional continuing education classes he has taken which have addressed "analyzing physical and electronic evidence of seat belt usage or performance in automotive accident investigations". Although he has been disqualified as an expert 6 times previously, he has never been

disqualified where his expert testimony addressed the issue of defective or malfunctioning seatbelts.  Phillips Affidavit, Ex. 4, ¶¶ 3-6.

A review of Phillips Affidavit and current Curriculum Vitae confirm he is clearly qualified to address the issues of whether the subject seat belt was being worn when this crash occurred, if it came unlatched during the crash, and if so, was there an unreasonably dangerous condition which caused the subject seat belt to unintentionally unlatch.  Mr. Phillips has dealt with restraint systems and seat belts throughout his over 30 years working as a professional mechanical engineer.[7]

Ford spends a sizable portion of this qualifications argument addressing a case where Phillips was not permitted to testify.  The case cited by Ford had nothing to do with seat belts and has clearly no relevance to whether Phillips is qualified to testify about seat belt performance and unreasonably dangerous buckles.  It can be guaranteed that in his almost 30 years of being a consulting automotive engineer, if Phillips had his qualifications questioned in the area of seat belts or seat belt buckles, Ford would have brought that to this Court's attention.  As Phillips has testified in his affidavit, he has never been disqualified from testifying in a case involving a claim of a defective seat belt.  Phillips Affidavit, Ex. 4, ¶5.

---

[7] It is interesting to note that Ford's seat belt expert, Eddie Cooper, does not appear to have his Professional Engineering license in any state, including his home state of Arizona as there is no such indication or reference on the CV he provided at his deposition.

Ford also takes issue with the fact Phillips was unable to state with certainty at the time of his deposition if the defect in the buckle was a manufacturing or design defect.   At the time of Phillips deposition, Ford had taken the position it had no design or specification information for the buckle as that was in the possession and control of TRW.   This is an interesting position given this buckle had previously been recalled, as well as 2 later internal investigations, but Ford continued to take the position it had no such information regarding the buckle.   Be that as it may, it was not until after Phillips deposition that via a subpoena to TRW, Plaintiff was able to obtain drawings and some specifications for the RNS4G buckle.   Phillips now has the information as contained in the TRW's DFMEA which indicates that fractured button return springs would be in non-compliance with Ford's specifications, thus providing further proof of a manufacturing defect.  *See,* Phillips Affidavit, Ex. 4, ¶ 7(h) and ¶(8) of Phillips' Conclusions, p. 11.

The crux of Ford's argument seems to be all the things Mr. Phillips cannot address, as somehow putting those things out there makes them relevant to the inquiry of whether this seat belt buckle was unreasonable dangerous with broken button return springs.  However, as one court has stated, "…the *failure* to offer an opinion about a subject on which one is *not* an expert cannot be a basis for exclusion under *Daubert." Harrison v. Ace Am. Ins. Co.,* 2010 U.S. Dist. LEXIS 68663, *11 (M.D. Ala. July 8, 2010.)   A review of Phillips' curriculum vitae and Affidavit

confirm he has the qualifications to address whether Mr. Easterling was restrained when this crash began, did the seat belt buckle perform in the crash as intended, if not, did an unreasonably dangerous condition exist in the buckle that caused it to unlatch in this crash and what was that unreasonably dangerous condition that caused the buckle to unlatch.

## C. PHILLIPS' OPINIONS ARE RELIABLE

To address the "reliability" prong of the *Daubert* inquiry, the Court is to look at whether the expert's opinions are based upon sufficient facts and data and an inquiry into the application of the methodology of the expert to the facts. *Rudd v. GMC,* 127 F. Supp. at 1336. And on the issue of the sufficiency of the basis for the opinion, the inquiry is if the expert had sufficient evidence to support the opinion, "not a determination of whether the testimony standing alone provides sufficient evidence to allow a reasonable fact-finder to find for the plaintiff on an issue of substantive law." *Id.* at 1336, footnote 5.

As it relates to this inquiry, Ford seems to focus on the "sufficiency of the basis" for Phillips' opinion that the subject RNS4G buckle with fractured button return springs was unreasonably dangerous or unfit for its particular purpose i.e. to restrain an occupant in a crash when latched. Ford complains of Phillips "wholesale lack of data or testing supporting his conclusory defect and alternative design

opinions" as the basis for them to be excluded.  To address this argument, it is important to first address Phillips methodology in reaching his opinions in this case.

As detailed in his Affidavit, Ex. 4  in ¶ 7, Phillips inspected the subject vehicle, imaged or downloaded the Restraint Control Module himself to see if it would indicate use of belt (which it did not address at all), reviewed all the first responder and police officer information, examined all known photographs of the subject vehicle and buckle, including those taken within a few weeks of the accident, examined exemplar RNS4G buckles, including disassembling buckles to examine their operation, reviewed the testing and analysis performed by Plaintiff's other expert, Eric Van Iderstine (whose work will be addressed *infra),* and reviewed and evaluated documents produced by Ford and recently by TRW, including the DFMEA, as well as certain testing and design documents for the RNS4G buckle specifically referenced in this Affidavit .

The work done by Eric Van Iderstine from McSwain Engineering is a key piece to the evidence Phillips evaluated to reach his opinions regarding the unreasonably dangerous nature of this buckle.  To encapsulate the work Van Iderstine has done in this case, he has also prepared an Affidavit which is attached hereto as Exhibit 25.  In his Affidavit, after detailing his qualifications and experience (*See,* Van Iderstine Affidavit, Ex. 9, ¶¶ 3-13) he addresses his CT work

and follow-up testing performed in this case.[8]  (Van Iderstine Affidavit, Ex. 9, ¶¶14-22.)  As explained in detail in the Affidavit, when Van Iderstine performed the initial CT of the subject RNS4G buckle, it revealed cracked/broken button return springs whose purpose was to return the push button to the home position.  This initial CT was done without the buckle being latched.  (Van Iderstine Affidavit, Ex. 9, ¶¶14-16).

Van Iderstine then quite easily obtained 2 exemplar RNS4G buckles which also had broken button return springs and not only examined them under CT, but performed testing on these exemplar buckles using a fixture that allowed the push button to be depressed in a repeatable position and give repeatable results.  This was all documented with still and video photography.  The testing showed that with the buckle not returned to full home position, the lock bar or locking pawl could be moved by the force of gravity permitting the buckle to unlatch.  Ultimately, Van Iderstine performed a CT examination of the subject buckle in a latched condition and confirmed that the fractured button return springs were providing virtually no assist to the button to return to its home position which is crucial for proper seating of the lock bar and latching pawl in the latch when the buckle is latched.  Normally when the buckle is unlatched, the button is being pushed in the home position by the

---

[8] It is important to note that after Ford's expert Cooper inspected the subject buckle and noticed it was not operating correctly because the button was failing to return to home, it was Ford's counsel, apparently based on a recommendation from Cooper, suggestion to use McSwain Engineering to do the CT work which the parties had agreed needed to be done to determine what was causing the button to fail to return to its home position.

button return springs and the ejector spring for the buckle.  However, as Van Iderstine notes: "When the latch plate is in place, the latch plate ejector spring is not adding any force to return the push button, reducing the force available to move the push button to its intended location."  Thus, when the button return springs aren't working due to being broken, the alignment of the lock bar or latching pawl in the latch is mismatched, allowing it to be unlatched in a crash situation such as this. (Van Iderstine Affidavit, Ex. 9, ¶¶ 19-22.)

With this repeatable and well documented testing confirming that broken return springs could result in an unlatching of the belt, Phillips was able to reach his opinion that the fractured return springs could result in an unintentional and inadvertent unlatching of the belt thus confirming the unreasonably dangerous condition of the subject buckle.  In Phillips' Affidavit he details each of the opinions he has reached in this case and the basis for each, including photographic evidence. (Phillips Affidavit, Ex.4,  ¶¶1-11 of his Conclusions, pp. 7-12.)  Among other things he confirmed that in the earliest photos after the wreck, on January 13, 2013, two weeks after the wreck, photos of the buckle showed the button in a less than home position, like how he found it when he first examined it.  Under CT examination from Van Iderstine, he was able to confirm that it was fractured and broken button return springs which were causing the button to not return to its home position. From the testing and scans conducted by Van Iderstine he was able to conclude that "[t]he

23

failure of the push button to return to full up position allows the lock bar to become disengaged from the latch plate allowing for the conditions of an inadvertent and/or unintended release of the seat belt assembly to occur." This has been further confirmed now by TRW's own DFMEA which indicates that a push button not returning to home can be caused by broken return springs, with the potential effect being "occupant not restrained", "no latch" or "partial latch". Moreover, as we see from the documents from Ford, it as well recognized during the 01S21 Recall of the RNS4G buckle and the subsequent internal investigations, that the button not returning to its home position was at best indicative of a buckle that was not working properly and at worse a "defective assembly." Ford Letter to Plaints, Ex. 19.

Ford's own seat belt expert Cooper used a similar methodology and looked at the same facts, except he did not testing to confirm his conclusions. A review of Cooper's report indicates he looked at the same materials reviewed by Phillips, performed a vehicle inspection and buckle inspection as did Phillips, and observed the results of the CT scans, and simply on that information, without any testing to confirm his opinions, he opined the buckle with fractured return springs was not defective. His methodology was essentially the same as Phillips except her reached a different result without any testing. This is sufficient reliability for a Ford expert's opinion. Phillips on the other hand, went further and had testing from Van Iderstine to confirm that the broken return springs could result in an inadvertent unlatching of

the buckle.  That is now confirmed by TRW, the entity responsible for the design and manufacture of the buckle, that a button failing to return to home due to fractured return springs can lead to an unlatching of the seat belt.

Ford also complains that Phillips alternative design of using metal springs to return the button instead of polymer/plastic, given they are less apt to break over time, is not sufficiently supported.  That is curious given Ford's expert Cooper bragged that he had seven hundred (700) different seatbelt assemblies in his facility, and testified that of every other buckle in the world between 2000-2010 of which Cooper was aware, the TRW RNS4G is the **only one** that utilizes polymer springs to return the button to its home position.  *See* Cooper Depo, Ex. 7 at 120-121. Clearly, even Cooper has to admit, this buckle with its plastic/polymer button return springs was an aberration and the state of the art in the 2000s was to use metal return springs as Phillips has opined.[9]

Ford is also heard to complain that Phillips was unable to say unequivocally whether this was a design or manufacturing defect.  As discussed *supra*, at the time of his reports and deposition, TRW had not produced the specifications, drawings and the DFMEA.  Since the production of those documents, there is indication from the DFMEA that broken return springs which cause the button not to return to home

---

[9] The issue of alternative design is only relevant for a claim of design defect. As also discussed, there is evidence now this may have been a manufacturing defect given TRW's DFMEA indication that a button not returning to home is not in keeping with the customer's, here Ford, specifications.

does not meet Ford's specifications thus qualifying this as a manufacturing defect. At this point, Phillips has provided sufficient indication of a defect, and alternative design that virtually every other buckle manufacturing was using, and evidence of a manufacturing defect.

Finally, Ford argues that Phillips has failed to address the expected life span issue and whether this was just a wear issue.  As Phillips stated in his deposition, if this was a design life issue, what makes this defect so problematic is that the consumer/user has no way to know he has fractured return springs that have now increased the potential for a failure of the buckle when worn in an accident.  The "less than home" position is in millimeters such that a consumer/user would not notice it.  Moreover, that buckle still "clicks" and latches and holds as you normally drive down the street.  Its only when faced with higher forces and acting on the buckle in a certain way, that the buckle fails and the latch breaks free, allowing the consumer/user to be a free moving object in the vehicle during the crash. "So it's – it's a hidden defect that an average consumer can't see or understand is happening and what the ramification are through replacement of the button and its inability to maintain the position of the lock bar."  Phillips Deposition, Ex. 10, pp. 275-276.  Even Ford's expert Cooper agrees that if the return springs fracture, information should be given to the consumer that they have a broken buckle.  Cooper Deposition, Ex. 7, p. 29-30.  If this part fails with broken return springs, it should

completely stop working so the consumer has feed back there is a problem that needs to be resolved.  That is the insidious nature of this unreasonably dangerous condition. The consumer is under the false notion he or she has a fully operating seat belt when in reality there is a buckle whose ability to perform as designed has been severely compromised.

### D. PHILLIPS' OPINIONS ARE RELEVANT AND "FIT"

The crux of Ford's argument on this issue of "relevancy" is that Van Iderstine's testing, which Phillips relies on for his opinions, tested the buckle and its ability to unlatch at a depressed button of 2.9 mm and not at the 1.72 mm that was found when the subject buckle was latched and CT scanned.  Thus, Ford argues, this testing has no value to this case or is not a proper basis upon which to base opinions. First, as Van Iderstine explains in his affidavit, the testing he performed where he recorded the result of 2.9 mm was done before the ONE measurement was done of the position of the button on the subject buckle after it was latched, so the 1.72 mm was not even known at the time that testing was performed.[10]   Van Iderstine Affidavit, Ex. 9, ¶24.  Also in his deposition Van Iderstine explained that this was not an exhaustive study to find the threshold when this would occur, but was to show

---

[10] It is important to note there has only been one latching and measurement done of the subject buckle which lead to the 1.72 mm measurement.

that a button that did not return to its home position could result in unlatching of the buckle.  Van Iderstine Deposition, Ex. 5, p.121-122.

Additionally, all the experts agree, including Ford's expert Cooper, that the position of the button and the measurement taken the ONE time the subject buckle was latched and a CT done (the 1.72 mm measurement) is not indicative of the position the button will return to each time it is latched.  Cooper Deposition, Ex. 7, p. 39.  Van Iderstine Affidavit, Ex. 9, ¶25.  It could be more, it could be less.  And yes, we are only talking differences in millimeters and tenths of millimeters.

More importantly, we now have undisputed proof from the buckle manufacturer TRW that broken button return springs can result in the buckle unintentionally unlatching.  The DFMEA clearly indicates this was a failure mode of the buckle that was considered by TRW and it recognized that if that failure happened, it could in fact result in an unlatching of the buckle.

Additionally, Ford asserts that Phillips' opinion that a force on the buckle could move the lock bar out of the latch plate slot and allow inadvertent unlatching is speculative.  Ford ignores the testing from Van Iderstine which showed that by inverting the buckle and thus 1 g of force being placed on the lock bar, will cause the latch to release.  We also know that Easterling's vehicle, according to Ford's own expert Hoover, had yawing and rolling forces applied to it during the crash sequence that included more than 2 rollovers.  Moreover, although there are no

witness marks on the buckle or console to indicate an impact, there is no evidence that such a witness mark would in fact be seen on either of these parts as result of contact. The testing performed by Van Iderstine confirms the forces necessary to move the lock bar out of the latch and Ford's own reconstruction confirms the forces necessary occurred in this accident. Although not to belabor the point, there is also the TRW DFMEA which clearly confirms this is a potential problem of what will occur because of fractured springs which fail to push the button to its full home position.

Ford also indicates in a footnote, that the Phillips' warning opinions are also inadmissible. The essence of these warning opinions is that given the insidious nature of this defect in that the consumer/user is unaware of the problem, Ford should have made all owners of vehicle with this RNS4G buckle that if the button was not returning to its full home position, you need to have your buckle replaced or at the least inspected by a dealer. They clearly knew how to provide this information as Ford had to provide this information to consumers as part of the 01S21 recall. This same simple information should have been provided to **all** owners of affected vehicles given the buckle "appears" to be operating when latched even with the broken button return springs. Phillips has clearly presented proper testimony and evidence why this warning is needed. Van Iderstine's testing of the exemplar buckles show that when latched, they still click and hold to some limited degree,

until a force acts on them causing it to inadvertently and unintentionally unlatch. Consumers need to be warned and informed to look for this issue since it is clearly not one apparent from just looking at the buckle.

### E. **PHILLIPS TESTIMONY IS ADMISSIBLE UNDER RULE 403**

Ford takes one more swing at Phillips' testimony by arguing it should not be admissible under Rule 403 because it would confuse a jury.  The standard under Rule 403 is that the probative value of the testimony must be outweighed **substantially** by the potential to confuse the jury.  It is enough to respond that Plaintiff has shown that Phillips' opinions are based on a proper methodology using all available evidence, including testing performed to confirm the effect of broken button return springs.  The issues are complex, but that is why expert testimony is necessary to explain this type of information to a jury.  There is no basis to exclude any of Phillips' opinions pursuant to Rule 403.

### CONCLUSION

The opinions Plaintiff's expert Donald Phillips has offered in this case meet the requirements prescribed by *Daubert* and Rule 702.  The opinions are reliable and relevant and Phillips has the qualifications to make the opinions he has presented. For these reasons, Defendant Ford's Motion to Exclude is due to be denied.

**DATED:**        This the 8th day of January, 2018.

*/s/ Craig P. Niedenthal*
Craig P. Niedenthal

State Bar No.:  ASB-3761-D38C
Andrew J. Moak

State Bar No.:  ASB-3266-N66M
SHUNNARAH INJURY LAWYERS
2900 1st Avenue South
Birmingham, Alabama 35233
P 205.983.8138
F 205.983.8438
amoak@asilpc.com
cniedenthal@asilpc.com
Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date provided the following with a copy of the foregoing via the *CM/ECF* system:

D. Alan Thomas
Paul F. Malek
Douglas Carmichael
Huie, Fernambucq & Stewart, LLP
Three Protective Center – Ste. 200
2801 Highway 280 South
Birmingham, Alabama 35223
P 205.251.1193
F 205.251.1256
athomas@huielaw.com
pmalek@huielaw.com


Melody H Eagan
LIGHTFOOT FRANKLIN & WHITE LLC
400 20 Street North
Birmingham, AL 35203
205-581-0700
205-581-0799 (fax)
meagan@lightfootlaw.com

/s/  Craig P. Niedenthal
OF COUNSEL