FILED
2018 Jan-08  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JERRY W. EASTERLING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:14-cv-02353-JEO** |
| | ) | |
| **FORD MOTOR COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Jerry W. Easterling, Plaintiff in the above-styled civil action, by and through his undersigned counsel of record, and pursuant to *Fed. R. Civ. P.* 56, hereby responds to Defendant Ford Motor Company's Motion for Summary Judgment as follows:

## Introduction

On December 30, 2012, Plaintiff Jerry Easterling (hereinafter referred to as "Easterling") suffered life threatening and permanent injuries in a single vehicle crash while driving to work in McCalla, Alabama in his 2003 Ford F-250 Super Crew pickup truck.  *See* Deposition of Jerry W. Easterling ("Easterling Depo"), attached hereto as

Exhibit "1" at 45, 55, 73, 81; *see also* Deposition of Dr. Brent Ponce ("Ponce Depo"), attached hereto as Exhibit "2," at 11, 13-15, 30, 35-37, 70.[1]

Easterling established with substantial evidence that his injuries were proximately caused by the unexpected failure of the defective driver's seatbelt in his vehicle during the crash sequence, which resulted from culpable conduct by Defendant Ford Motor Company (hereinafter referred to as "Ford") under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), Ford's implied warranties and common law negligence.  *See* Complaint (Doc. 1); *see also* Easterling Depo, Ex. 1 at 10, 55, 88, 89, 106; *see also* Ponce Depo, Ex. 2 at 25, 51; *see also* Excerpts from Deposition of Debora Marth ("Marth Depo"), attached hereto as Exhibit "3;" *see also* Affidavit of Donald R. Phillips, P.E. ("Phillips Affidavit"), attached hereto as Exhibit "4" at p. 7-11; *see also* Deposition of Eric Lee Van Iderstine ("Van Iderstine Depo"), attached hereto as Exhibit "5" at 80-82, 101, 146.

Ford denies that Easterling has established his case, and Ford's summary judgment focuses on seven (7) arguments: (a) that Easterling cannot prove that a "defect" existed, (b) that Easterling cannot establish that a reasonable alternative design existed, (c) that Easterling cannot establish a manufacturing defect, (d) that Easterling cannot link his injuries to any act or omission by Ford, (e) that Easterling cannot demonstrate a breach of Ford's implied warranties, (f) that Easterling cannot establish

---

[1] The exhibits to this Opposition and the Opposition to the Motion to Preclude are the same.  The referenced exhibits to this Opposition brief were filed as part of Plaintiff's Opposition to the Motion to Preclude so there is one set of master exhibits for both briefs.

that Ford failed to adequately warn of the hazard posed by its buckle and (g) that Easterling cannot establish wantonness. *See* Ford's Brief in Support of Motion for Summary Judgment ("Def. Brief") (Doc. 39) at 10-22.

Although Ford's summary judgment is couched as seven (7) discrete arguments, the common thread running through each of Ford's arguments other than its argument as to wantonness is that Easterling's proffered expert opinions are inadequate or invalid. *See* Id. Ford's support of this argument rests on a myopic and constrained view of the facts bearing little relationship to the realities of the evidence, and Ford's motion is due to be denied.

## **Standard of Review**

Rule 56(c) of the *Federal Rules of Civil Procedure* provides that a party seeking summary judgment bears the initial burden of demonstrating to the court the basis of its motion, and bears the further burden of identifying those portions of the pleadings, depositions, affidavits, answers to interrogatories and admissions that it believes show an absence of any genuine issue of material fact. For the purpose of summary judgment, an issue of fact is material if it is a legal element of the claim, as identified by substantive law governing the case, such that its presence or absence might affect the outcome of the lawsuit. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See *Matsushita Electrical Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Accordingly, "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Federal Rules of Civil Procedure* 56(c). However, the trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Once the moving party has met its initial burden of demonstrating that no genuine issues of material fact exist, the non-moving party must make a sufficient showing by substantial evidence to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial. See *Howard v. BP Oil Company*, 32 F. 3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Finally, in deciding a summary judgment, the "[c]ourt must review the record in the light most favorable to the non-moVant and must resolve all reasonable doubts against the moVant." *Van Voorst v. Federal Exp. Corp.*, 16 So. 3d 86, 90 (Ala. 2008) (citing *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997)).

## Statement of Facts

At the time of this crash, Easterling owned a 2003 Ford F-250 Super Crew pickup truck, which he purchased during the summer of 2007. *See* Easterling Depo, Ex. 1 at 55, 59. Easterling is skilled in the field of industrial construction and electrical

work, skills acquired by education, training and experience.  *See* Easterling Depo., Ex. 1 at 11-20.  In 2012, Easterling, who resides in Chilton County, Alabama, was employed by Coalmont Electrical, located in McCalla, Alabama.  *See* Easterling Depo, Ex. 1 at 45-46.  In the early morning of December 30, 2012, he set out for work and was traveling from his home to his job in McCalla along Morgan Road in Jefferson County, when his vehicle suddenly struck a patch of ice, causing Easterling to lose control of the truck.  *See* Easterling Depo, Ex. 1 at 45, 82, 83, 87; *see also* Alabama Uniform Traffic Accident Report, Defense Ex. A.

The crash was grievous.  According to Ford's own retained accident reconstructionist, Easterling's vehicle yawed significantly during the crash sequence and rolled approximately 2 ¾ times before finally coming to rest on the driver's side.  *See* Excerpts from Deposition of Todd Hoover ("Hoover Depo"), attached hereto as Exhibit "6," at 7, 21-22, 217; *see also* Easterling Depo, Ex. 1 at 98.  Easterling's memory of the crash sequence is understandably limited, but he recalls that when the vehicle came to a stop, his "butt" was on the driver's side window, his head was pinned between the front seat and the steering wheel, his legs were twisted and his seatbelt was unbuckled, with the webbing twisted around his left arm.  *See* Easterling Depo, Ex. 1 at 88-89, 106.

Easterling is a habitual seatbelt user, and he wore his seatbelt regularly while operating his 2003 F-250, facts supported by physical evidence uncovered by Ford's seatbelt expert, Eddie Ray Cooper, who acknowledged that Easterling's seatbelt

restraint system showed signs of typical and consistent use. *See* Easterling Depo, Ex. 1 at 94; *see also* Excerpts from Deposition of Eddie Ray Cooper ("Cooper Depo"), attached hereto as Exhibit "7," at 77, 85. Easterling was appropriately wearing his seatbelt on December 30, 2012 when the Ford vehicle struck ice, and sometime during the crash, the seatbelt unbuckled. *See* Easterling Depo, Ex. 1 at 45, 89, 106.

Easterling's injuries were also grievous and consistent with the nature of the crash, including, without limitation, the following:

1) Comminuted bilateral scapular fractures;
2) Bilateral rib fractures, ribs 2-7;
3) Bilateral lung contusions;
4) Bilateral hemothorax;
5) A T6 spinous process fracture;
6) An anterior mediastinal hematoma;
7) Bilateral C2 transverse process fractures;
8) Vertebral body fractures, C6/C7;
9) A possible temporal bone fracture; and
10) A right 5th metacarpal fracture.

*See* Ponce Depo, Ex. 2 at 8-15.

Dr. Ponce testified that each of Easterling's injuries were caused by the crash and that the scapular fractures in particular were produced by great force applied to those anatomical structures. *See* Ponce Depo, Ex. 2 at 25, 51, 63. Dr. Ponce, a UAB orthopedic surgeon who specializes in shoulder injuries, noted that it is rare in his experience to see a patient with two (2) scapular fractures. *See* Ponce Depo, Ex. 2 at 5, 63. However, not only did Dr. Ponce opine that these injuries are rare and were produced by great force, he also opined that it is rare for a patient to survive such

injuries.  *See* Ponce Depo, Ex. 2 at 63, 70.  In fact, according to Dr. Ponce, when Easterling entered his care, he was "really sick" and was "fortunate to survive," given the significance of his injuries.[2]  Ponce Depo, Ex. 2 at 30.

Dr. Ponce further testified that, although Easterling's shoulder fractures eventually healed, they healed in a "non-anatomic position" that altered the normal mechanics of his shoulders, meaning that Easterling cannot lift his arms above his shoulders without pain and a limitation on his ability to do overhead activity.  *See* Ponce Depo, Ex. 2 at 35-36, 46.  Dr. Ponce is also of the opinion that surgery will not fix this problem and Easterling's pain will continue.   *See* Ponce Depo, Ex. 2 at 37. Understanding Easterling's physical limitations, Dr. Ponce found Easterling's efforts to work within his limitations to be "admirable."  Ponce Depo, Ex. 2 at 72-73.

Even Ford's retained biomechanics expert, Debora Marth, acknowledged that bilateral scapular fractures, especially comminuted fractures, are unusual injuries because "the scapula is actually a very difficult bone to break because parts of it are quite thick…[and] it's also sort of encased by the muscles of the back on both sides." Marth Depo, Ex. 3 at 53-54.  Marth testified that these fractures likely were caused by the application of "several hundred pounds of force," and admitted that Easterling's

---

[2] Given this undisputed testimony, it is puzzling yet perhaps emblematic of Ford's approach to the facts of the case that they elected in their brief to characterize Easterling's injuries to the Court as "non-life threatening."  Def. Brief (Doc. 39) at 4.

"large constellation of injuries" "could have been fatal."[3]  Marth Depo, Ex. 3 at 53-54, 66.

Based on her analysis, Marth further agreed that, in her opinion, if Easterling had his seatbelt latched during the entire crash sequence, he "[a]bsolutely" would not have experienced either this pattern of injuries or level of injuries.  Marth Depo, Ex. 3 at 66.  In other words, Ford does not dispute that Easterling's injuries are inextricably linked, both in their nature and severity, to the seatbelt being unlatched; instead, Ford predictably argues that Easterling was unbelted before the crash began.  Marth Depo, Ex. 3 at 23-24.

Paramedics from Regional Paramedical Services responded to the scene of the crash, extracting Easterling from his vehicle and transporting him to UAB Medical Center.  *See* Ex. A to Defendant's Motion for Summary Judgment; *see also* Deposition of Nathan Dunaway ("Dunaway Depo"), attached hereto as Exhibit "8," at 25.  At the scene of the crash, after sustaining all his injuries, Easterling stated, and Dunaway recorded, that Easterling was wearing his seatbelt at the time of the crash, but his seatbelt broke.  *See* Dunaway Depo, Ex. 8 at 20, 23-24.

Ford's seatbelt expert, Cooper, inspected the Ford vehicle following the crash. *See* Cooper Depo, Ex. 7 at 31-33.  Cooper's inspection included an inspection of Easterling's seatbelt system, and Cooper noticed upon cycling the seatbelt buckle that

---

[3] The undisputed nature of Easterling's near-fatal injuries again raises the question as to why Ford elected to characterize Easterling's injuries to the Court as "non-life threatening."  Def. Brief (Doc. 39) at p. 4.

the buckle's release button "did not return," which he immediately recognized as an "anomaly" that required him to stop the inspection of the seatbelt system at that time. *See* Cooper Depo, Ex. 7 at 32-33, 41.  Cooper then recommended that the Plaintiff utilize the services of McSwain Engineering to perform a CT scan inspection of the buckle to further investigate.  *See* Cooper Depo, Ex. 7 at 52; *see also* Van Iderstine Depo, Ex. 5 at 4-5.

Eric Lee Van Iderstine (hereinafter referred to as "Van Iderstine") is a professional engineer who, during his career as a mechanical design engineer and mechanical engineering manager, has designed equipment for the manufacture, assembly and testing of automotive components and systems for automotive companies, including both Ford and TRW.  The subject buckle in this case is known as a TRW RNS4G model buckle assembly, and Van Iderstine was initially asked to perform a CT scan on the subject buckle.  *See* Van Iderstine Depo, Ex. 3 at 4; *see also* Affidavit of Van Iderstine ("Van Iderstine Affidavit"), attached hereto as Exhibit "9," ¶ 3-13.

CT radiography of the subject buckle revealed that a pair of latch guide springs that serve to move the buckle button back to its home/full-return position was broken or cracked, were out of position and were not in contact with the intended surfaces of the buckle button, thus providing no force to move the button to its proper position.  *See* Van Iderstine Affidavit, Ex. 9 at ¶ 14-16.

Van Iderstine was then asked to locate exemplar buckles from other vehicles and to perform engineering analysis on those buckles; Van Iderstine was able to procure

three (3) exemplar buckles from salvage yards that were within the design range of the subject buckle and displayed the same button anomaly on visual inspection. *See* Van Iderstine Depo, Ex. 5 at 5, 58-59. The buckles displaying driver-side button anomalies similar to those displayed by the subject buckle were easy to locate and were procured within one (1) day. *See* Van Iderstine Depo, Ex. 5 at 62. Van Iderstine performed a CT scan on the exemplar buckles and found that they each had cracked or broken springs identical to the subject buckle's cracked/broken springs. *See* Van Iderstine Depo, Ex. 5 at 80.

Van Iderstine was then asked to evaluate and determine the effects of the broken springs on the RNS4G buckle's mechanism and on the buckle's ability to retain the seatbelt latch plate. *See* Van Iderstine Depo, Ex. 5 at 5. Van Iderstine's engineering opinion in this regard is as follows:

> Specifically, the evaluation showed that if the button was not in a fully returned position, that – that the features and the design of the – of the buckle are such that the feature that's intended to keep the latch plate in place – it's referred to as the lock bar – that the lock bar was – was not securely held in place and was allowed under – under – under gravitational load to move out of position to a point that the latch plate was able to release from the buckle.

Van Iderstine Depo, Ex. 5 at 80.

Van Iderstine testified that both exemplar buckles demonstrated the same performance. *See* Van Iderstine Depo, Ex. 5 at 81. Van Iderstine essentially observed that if the buckle's button is partially depressed, the latch plate can be liberated from

the buckle by inverting the buckle and subjecting it to a minimal 1G load, but the same result can also be accomplished by simply pulling on the latch plate by hand.  *See* Van Iderstine Depo, Ex. 5 at 81.

Van Iderstine's testing was performed partly inside a computerized tomography (CT) machine, and a fixture for the buckle was therefore required both in order to allow the buckle button to be positioned in a repeatable manner to demonstrate a minimal partial depress of the buckle button and also to prevent human exposure to x-ray radiation inside the machine.  *See* Van Iderstine Depo, Ex. 5 at 80; *see also* Van Iderstine Affidavit, Ex. 9 at ¶ 21.

Van Iderstine created a custom fixture for this purpose in a 3D printing machine, consistent with design methodologies he has used in designing other test fixtures and test systems for automotive clients, including Ford and TRW; the fixture and the subsequent testing used accepted mechanical engineering techniques and principles, and was performed on equipment that is state-of-the-art.  *See* Van Iderstine Depo, Ex. 5 at 9; *see also* Van Iderstine Affidavit, Ex. 9 at ¶ 21.

The demonstrations Van Iderstine subsequently performed on the subject buckle show that the buckle button, in a partially-depressed condition, would allow the latch plate to come out of the buckle.  *See* Van Iderstine Depo, Ex. 5 at 83.  The "partially-depressed" condition is represented in extremely small tolerances measured in sub-millimeters.  *See* Van Iderstine Depo, Ex. 5 at 90-99.  Van Iderstine took some

measurements to demonstrate this; without depressing the button in any way, the button was measured to be depressed by 1.72 mm.  *See* Van Iderstine Depo, Ex. 5 at 94.

Van Iderstine testified that, based on his CT testing and observations, at this 1.72 mm partially-depressed level, the buckle button is compromised, and the latch plate can come out of the buckle.  *See* Van Iderstine Depo, Ex. 5 at 96, 99.  However, Van Iderstine also observed and testified that the precise amount of the depressed state of the button, whether 1.9 mm, 1.7 mm, 2.5 mm or 2.9 mm is of no material significance, as all of the buckles were slightly different in the amount that their buttons were depressed when measured in hundredths of millimeters and it was not possible to know the subject button's precise position in space down to a sub-millimeter measurement on the date of this crash.  *See* Van Iderstine Depo, Ex. 5 at 90-91, 105.  What was important to Van Iderstine was that, regardless of the sub-millimeter measurement, at someplace around a 2 mm depressed condition, the buckles are compromised and can release the latch plate.  *See* Van Iderstine Depo, Ex. 5 at 82, 91.

Van Iderstine opined that without the latch plate properly in place, the subject RNS4G buckle button is in a "depressed condition that should not be the case if the buckle is – is functioning properly."  Van Iderstine Depo, Ex. 5 at 82.  Based on this, Van Iderstine concluded "the buckle to be in a compromised condition."  Van Iderstine Depo, Ex. 5 at 82.

While testing the buckle in the CT machine, Van Iderstine used a threaded nylon screw installed in the fixture to hold the buckle button in a partially-depressed

state of 2.9 mm that was in no way intended to look for a "threshold" or "transition" point, merely a repeatable position from which to conduct a test in an irradiated environment. *See* Van Iderstine Depo, Ex. 5 at 11, 121-123. Ford is critical of Van Iderstine's test, even though Van Iderstine expressly cautioned Ford (and Ford ignores in their summary judgment brief) that there is nothing "magical" about a 2.9 mm partially-depressed button, as "anything" on or around 2 mm or more "would or could result in the lock bar not being properly held in place." Van Iderstine Depo, Ex. 5 at 90-91.

There has never been any disagreement between the Plaintiff and Defendant that the button return springs inside the buckle are cracked and broken and that the buckle's button does not return fully to its home position. *See, e.g.* Van Iderstine Depo, Ex. 5 at 5, 80; *compare* Cooper Depo, Ex. 7 at 31-33, 41, 52.

Van Iderstine testified, and Ford ignores, that regardless of whether the subject buckle is in any fixture, it is in a "compromised state" where the "functionality of the button is…no longer as it was intended, and it has rendered the buckle compromised, such that the lock bar can come out of position." Van Iderstine Depo, Ex. 5 at 146-147. Ford chose not to subject any of Van Iderstine's opinions, including this one, to *Daubert* challenge.

Van Iderstine also pointed out that, regardless of the subject buckle button's precise position in space, the buckle mechanism produced an audible click every time the latch was inserted into the buckle, whether the buckle was or was not in a fixture.

*See* Van Iderstine Depo, Ex. 5 at 101-102.  This observation comports with Easterling's own practical observation that on a few occasions, he put the subject seatbelt latch into the subject buckle and did not feel or hear it click – but that he would "push it down again and it would – it would click."  Easterling Depo, Ex. 1 at 105.

Van Iderstine stated that the "audible click" is a typical sign to a typical consumer that "they have inserted the buckle properly," which, again, comports with Easterling's practical experience with this buckle.  Van Iderstine Depo, Ex. 5 at 141; *see also* Easterling Depo, Ex. 1 at 105.  Van Iderstine pointed out that when a compromised buckle like the subject buckle continues to accept a latch plate and audibly clicks, the it is "reasonable for the consumer to have an understanding that it's still functional."  Van Iderstine Depo, Ex. 5 at 146.  According to Van Iderstine, "the most effective design would be one that when the design is compromised, that it would just suffer a – a catastrophic lack of – or loss of functionality, such that it's unusable that would be apparent to a user."  Van Iderstine Depo, Ex. 5 at 142-143.

Donald Phillips, also a professional engineer, concurs with Van Iderstine that the subject buckle button fails to return to home, that the subject buckle has cracked return springs and that the failure of the button to return home allows for the lock bar to disengage from the latch plate and release the seat belt assembly.  *See* Phillips Affidavit, Ex. 4 at p. 9-10.  According to Phillips, there is a linear relationship between the vertical button position and the feature that maintains the integrity of the lock bar

that prevents the buckle from releasing.  *See* Deposition of Donald Phillips ("Phillips Depo"), attached hereto as Exhibit "10," at 171.

Phillips also states that the violence of this crash produced sufficient forces and directions of forces that would have allowed the compromised buckle to unlatch during the crash sequence.  *See* Phillips Affidavit at p. 10.  This notion is hardly controversial, as Ford's own accident reconstructionist, Hoover, also describes the violence of the crash; in fact, if anything, Hoover's opinion is that the crash was *more* violent than Phillips believed it to be.  *See* Hoover Depo, Ex. 6 at 7, 21-22, 217.  Phillips testified that there were at least two (2) opportunities during the crash sequence for Easterling's buckle to unlatch, first during the initial rightward/Eastward yaw, and second, when Easterling's truck engaged the rock wall.  *See* Phillips Depo, Ex. 10 at 121, 125, 126.  Phillips opines that Easterling's seatbelt system failed to hold him in place, based on the compromised condition of the buckle and Easterling's own testimony.  *See* Phillips Affidavit at p. 11.[4]

As it turns out, the subject buckle's propensity to become improperly unlatched when compromised by broken return springs and a non-returned button was understood prior to this crash; in the Design Failure Mode and Effects Analysis (DFMEA) for the TRW RNS4G buckle, TRW states that "pushbutton must remain in full out position," and states that when "pushbutton does not remain in full out position," the buckle is in

---

[4] For a significant discussion of Phillips' opinions in this case, see Plaintiff's Opposition to Defendant's Motion to Exclude the testimony of Phillips filed contemporaneously with this Opposition.

"potential failure mode."   Excerpt from Design Failure Mode & Effects Analysis ("DFMEA"), TAAI-8601, attached hereto as Exhibit "11."  The DFMEA acknowledges that the failure is potentially caused when "latch guide leaf springs have inadequate force to return pushbutton to full out position when latched."  DFMEA, Ex. 11.

Furthermore, the potential effects of the failure were understood prior to this crash, as follows:

1)  "Occupant Not Restrained;"

2)  "No Latch;"

3)  "Partial Latch;"

4)  "Non-Conformance to Federal Spec;" and

5)  "Non-Conformance to Customer Spec."

DFMEA, Ex. 11.

The TRW RNS4G buckle was the subject of a product recall in 2001, and a letter went out to owners of Ford vehicles with this buckle acknowledging that either, or both, of the front, outboard buckles may not have been fully latching.  *See* Ford Correspondence, July 2001, attached hereto as Exhibit "12."  Ford understood that, at the time of the recall, a problem with the RNS4G was that the release button was not returning to its home position, which could result in the tongue being "easily removable from the buckle by wiggling the tongue back and forth laterally."  Ford Email Thread, May 25, 2001, attached hereto as Exhibit "13."

While the subject buckle is not subject to the 2001 recall, the fault (a non-returning button) and the consequence (unlatching) that Ford understood and confronted in 2001 are the same faults that placed the subject buckle in a "compromised state" where the "functionality of the button is…no longer as it was intended, and it has rendered the buckle compromised, such that the lock bar can come out of position." Van Iderstine Depo, Ex. 5 at 146-147.

In one day after being retained in this case, with minimal effort, Van Iderstine was easily able to identify and procure three (3) other buckles of the same, post-recall design period that all had similar faults (a non-returning button) and similar consequences (unlatching) as the subject buckle – and all of these buckles behave the same way that pre-recall buckles behaved.  *See* Van Iderstine Depo, Ex. 5 at 5, 58-59.

There is clearly evidence in this case that the problem of a non-returning button and unintended unlatching continued into the design period past the Ford RNS4G recall, and that Ford continued to receive and investigate those problems, which they eventually attributed to "contamination" and "sticky, gooey" substances.  Excerpts from Deposition of Charles Clement, attached hereto as Exhibit "14," at 64-67.

Although a similar fault and consequences were present in Easterling's subject buckle, there is substantial evidence that the button return fault is attributed directly to the defective, broken springs – and there is certainly no evidence of "sticky, gooey" contamination in the subject buckle.  *See* Van Iderstine Depo, Ex. 5 at 80.

Phillips' opinions as to the design of the TRW RNS4G buckle are the subject of Ford's separate criticism in their contemporaneously-filed Motion to Exclude portions of his opinions. *See* Ford's Motion to Exclude Opinions of Plaintiff's Expert Donald R. Phillips, P.E. (Doc. 40) and the Plaintiff's Opposition which has been filed contemporaneously with this brief.

However, Phillips' opinions in that regard are limited merely to the question of the broken button return springs and the unsuitability of their design. *See* Phillips Depo, Ex. 10 at 194-195. TRW's own DFMEA concerning this buckle indicates that the pushbutton's failure to remain in full-out position may be indicative of either "broken latch guide leaf springs" and "inadequate design." *See* DFMEA, Ex. 11.

Phillips states that metal return springs are a clear design alternative that already exist and are not subject to the kind of cracking seen in the subject buckle and all the exemplar buckles located by Van Iderstine. *See* Phillips Depo, Ex. 10 at 194-195. Even Cooper, Ford's seatbelt expert, admits that a buckle with metal springs is a feasible alternate design for a seatbelt buckle. *See* Cooper Depo, Ex. 7 at 120-121. During his deposition, Cooper bragged that he had seven hundred (700) different seatbelt assemblies in his facility, and testified that of every other buckle in the world between 2000-2010 of which Cooper was aware, the TRW RNS4G is the only one that utilizes polymer springs to return the button to its home position. *See* Cooper Depo, Ex. 7 at 120-121.

It is undisputed for the purposes of this case that TRW's RNS4G buckle is isolated as the only known buckle design on the planet at the time that this buckle was made that used button return springs made of a material other than metal.

## Argument

## I.  EASTERLING HAS PROVEN THE EXISTENCE OF A PRODUCT DEFECT BY SUBSTANTIAL EVIDENCE.

Ford argues in its Motion for Summary Judgment that the Plaintiff has not presented substantial evidence that Easterling's RNS4G buckle was defective, and predicates nearly its entire argument on the following assertion: "[Donald Phillips] is the only expert proclaiming that the seat belt, and in particular its button return springs, are defective."[5]  Def. Brief (Doc. 39) at p. 11.  The only way the Defendant can support this argument is by ignoring the unchallenged testimony and opinions of Van Iderstine, who established the existence of a defect with specificity, and by essentially pretending that Van Iderstine's testimony doesn't exist for the purposes of their motion.

A "defect" in a product has long been defined in Alabama as "that which renders a product 'unreasonably dangerous,' i.e. not fit for its intended purpose," and a "defective" product is one that "does not meet the reasonable expectations of an ordinary consumer as to its safety."  *Casrell v. Altec Indus.*, 335 So. 2d 128, 133 (Ala. 1976) (citing *Reyes v. Wyeth Laboratories*, 498 F. 2d 1264 (5th Cir. 1974), *Borel v. Fibreboard Paper Products Corporation*, 493 F. 2d 1076 (5th Cir. 1973)).  The question

---

[5] While Ford is challenging a portion of Phillips' opinions in a separate *Daubert* motion, it did not directly challenge Van Iderstine's opinions with a similar motion.

of whether a product is "unreasonably dangerous" is a fact question for the jury.  See

*Atkins v. American Motors Corp.*, 335 So. 2d 134, 142 (Ala. 1976).

Ford took Van Iderstine's deposition, and Ford asked Van Iderstine to provide

all of his opinions and conclusions generated pursuant to his testing and evaluation "in

a fundamental sort of unabridged way," just as though he was "speaking to a jury."  Van

Iderstine Depo, Ex. 5 at 77.  In response, Van Iderstine told Ford:

> Specifically, the evaluation showed that if the button was not in a fully
> returned position, that – that the features and the design of the – of the
> buckle are such that the feature that's intended to keep the latch plate
> in place – it's referred to as the lock bar – that the lock bar was – was
> not securely held in place and was allowed under – under – under
> gravitational load to move out of position to a point that the latch plate
> was able to release from the buckle.

Van Iderstine Depo, Ex. 5 at 80.

Van Iderstine confirmed for Ford that every exemplar buckles he obtained

demonstrated the same degraded performance.  *See* Van Iderstine Depo, Ex. 5 at 81.

Van Iderstine testified that, in its degraded condition, the latch plate can be released

from the buckle by subjecting it to a minimal 1G load while inverted, and the same

thing can be accomplished by simply pulling the latch out of the buckle by hand.  *See*

Van Iderstine Depo, Ex. 5 at 81.

The buckle is not supposed to do things like this.  The seatbelt is part of a

restraint system.  *See* Cooper Depo, Ex. 7 at 6, 52, 62.  If a seatbelt comes unlatched

under minimal load, or can be unlatched by pulling by hand, then it isn't doing its job

as a restraint system, isn't "fit for its particular purpose" of restraint and certainly does

not meet the reasonable expectation of a consumer that the seatbelt will restrain an occupant in a crash in even a minimal way.  *Casrell v. Altec Indus.*, 335 So. 2d 128, 133 (Ala. 1976) (citation omitted).

Van Iderstine testified further that the subject and exemplar buckles are in a "compromised condition" due to the broken return springs, the button that does not fully return home and the effect of those conditions on the ability of the restraint system to remain latched appropriately, and that the button would not be in its depressed condition if the buckle were "functioning properly."  Van Iderstine Depo, Ex. 5 at 82.  Ford does not dispute that the button return springs are cracked and broken and that the buckle's button does not fully return to its home position.  *See, e.g.* Van Iderstine Depo, Ex. 5 at 5, 80; *compare* Cooper Depo, Ex. 7 at 31-33, 41, 52.

Finally, as pointed out previously, Ford ignores Van Iderstine's opinion that the "functionality of the button…is no longer as it was intended, and it has rendered the buckle compromised, such that the lock bar can come out of position."  Van Iderstine Depo, Ex. 5 at 146-147.

There is no requirement anywhere in the law that an expert must use magic words like "defect" to describe a defect; it is clearly sufficient that a defect renders a product like a seatbelt unreasonably dangerous, "that is, *not fit for the ordinary purposes intended*."  *Atkins*, 335 So. 2d 134, 142 (Ala. 1976).  In fact, according to one of the cases cited approvingly by Ford, if a product is unreasonably dangerous by its unfitness for its ordinary purpose, the law is quite clear that there is no requirement that the

Plaintiff must provide proof of any "specific defect" at all.  See *Jordan v. General Motors Corp.*, 581 So. 2d 835, 837 (Ala. 1991) (citing *Casrell*, 235 So. 2d at 131).  The Plaintiff has established strong evidence that the subject buckle is in a condition that compromises its functionality and makes it unfit for occupant restraint, and this is sufficient under the law.

While Easterling agrees with Ford that expert testimony is required to establish substantial evidence of a defect in a complex product liability case, the cases cited by Ford are not helpful to the Court's decision in this case.  In *Jordan v. General Motors Corp.,* the Plaintiff hired an expert who looked at a seatbelt and found neither a specific defect nor any evidence that it was unreasonably dangerous, and in *Brooks v. Colonial Chevrolet-Buick, Inc.*, a case involving a multi-component brake system, the Plaintiff did not hire an expert at all.  See *Jordan,* 581 So. 2d 835 (1991); see also *Brooks,* 579 So. 2d 1328 (1991).  This case is different.

In this case, the Plaintiff hired a firm suggested by Ford's expert, who used testing recommended by Ford's expert to look at a seatbelt and to "determine or demonstrate what the effect of…the broken springs were on the…mechanism and the buckle's ability to retain the latch plate."  Van Iderstine Depo, Ex. 5 at 5; Cooper Depo, Ex. 7 at 54 ("I had been to Dr. McSwain's facility before and knew their personnel and their machines fairly well, so I was confident in who was going to do the CT scan.").  This area of inquiry by Van Iderstine is clearly pointed at the proper function of the

restraint system at issue in this case, and is obviously relevant to the question of the alleged defect in Ford's buckle.  None of this is any surprise to Ford.

Van Iderstine's deposition was Ford's deposition, Ford asked the questions and Ford elicited "fundamental, unabridged responses" from Van Iderstine that it knew were to be intended to be "spoken to a jury," because they asked for exactly that. Van Iderstine Depo, Ex. 5 at 77.  Ford now incongruously tells the Court that there is no Plaintiff's expert other than Donald Phillips who is "proclaiming that the seat belt, and in particular its button return springs, are defective."  Def. Brief (Doc. 39) at 11.

Van Iderstine's opinions are not proclamations.  Van Iderstine provided Ford with well-considered opinions squarely addressing basic malfunctions of the subject and exemplar buckles based upon his education, training, experience, testing, observations and evaluation, which Ford simply chose to pretend do not exist. Easterling has met the applicable legal standards necessary to prove that the subject product is defective for the purpose of submitting that claim to the trier of fact, and Ford's motion as it relates to the question of "defect" is due to be denied.

## II.   EASTERLING HAS PRESENTED SUBSTANTIAL EVIDENCE OF BOTH A DESIGN DEFECT AND A REASONABLE ALTERNATIVE DESIGN, AND HAS DEMONSTRATED THAT THE DEFECT CAUSED OR ENHANCED HIS INJURIES.

While an automobile manufacturer has no duty to design vehicles that are accident-proof, it does have a duty to design the vehicle and its component parts to avoid subjecting the consumer to an unreasonable risk of injury in the event of a

collision.  See *General Motors Corp. v. Edwards,* 482 So. 2d 1176, 1181 (Ala. 1985). This claim, at its core, is a claim that Easterling's buckle did not properly protect him during this crash, causing or enhancing his injuries.  See *Edwards*, 482 So. 2d at 1181-1183.

One of the components of this claim is that the Plaintiff must demonstrate the existence of a safer, practical, alternative design for the broken parts of this defective buckle that was available to Ford at the time it manufactured Easterling's truck.  See *Edwards*, 482 So. 2d 1191-1192.  The accepted manner of proving the existence of a safer, practical, alternative design is to produce evidence that (1) the plaintiff's injuries would not have occurred or would have been less severe, and (2) that the usefulness of the alternative design outweighed the usefulness of the design used.  See *GMC v. Jernigan*, 883 So. 2d 646, 669 (Ala. 2003) (citing *Hannah v. Gregg, Bland & Berry*, 840 So. 2d 839, 858 (Ala. 2002).

As to the first component of this test, Phillips has testified that metal return springs are a clear design alternative that already exist and are not subject to the kind of cracking seen in the subject buckle and all of the exemplar buckles located by Van Iderstine.  *See* Phillips Depo, Ex. 10 at 194-195.  During his deposition, Cooper bragged that he had seven hundred (700) different seatbelt assemblies in his facility, and testified that of every other buckle in the world between 2000-2010 of which Cooper was aware, the TRW RNS4G is the only one that utilizes polymer springs to return the button to its home position.  *See* Cooper Depo, Ex. 7 at 120-121.  It is undisputed for the purposes

of this case that TRW's RNS4G buckle is isolated as the only known buckle design on the planet at the time that this buckle was made that used button return springs made of a material other than metal.  Moreover, TRW's own DFMEA concerning this buckle indicates that the pushbutton's failure to remain in full-out position may be indicative of either "broken latch guide leaf springs" and "inadequate design."  *See* DFMEA, Ex. 11.

In this case, we are talking about springs that are designed not to break, not the construction of a nuclear reactor or a moon rocket engine.  Phillips testified and was savaged by Ford for stating the sort-of-obvious: that the faulty buckle with the broken springs that cause the latch failure should utilize more robust springs and that the more robust springs should be made of metal instead of a polymer (*i.e.* plastic). *See* Phillips Depo, Ex. 10 at 194-195.   Even Ford's expert agrees that this is a viable design and that every other buckle he knows of in the entire world during the time period in question uses metal springs.  *See* Cooper Depo, Ex. 7 at 120-121.

The Alabama Supreme Court has been critical of corporate automotive appellants in product liability cases who "[parse] the record" looking for "what they depict as a fatal gap in the proof of the availability of a safer, practical alternative design."  *GMC v. Jernigan*, 883 So. 2d 646, 663 (2003).  In this case, TRW's own internal documents indicate that broken springs are indicative of design faults, and Ford does not dispute that the TRW RNS4G with the broken button return springs is (a) alone on the planet in its use of plastic button return springs and (b) that it is clearly feasible

for a buckle to be designed that way.  *See* DFMEA, Ex. 11; *See* Cooper Depo, Ex. 7 at 120-121.  If one is not parsing the record, but looks at the evidence as a whole, the faults are clear.

Easterling testified that he wore his seatbelt when he set out on December 30, 2012 in his Ford vehicle, and that his seatbelt was unlatched after impact.  *See* Easterling Depo, Ex. 1 at 45, 89, 106.  Easterling, as he lay critically injured and fighting for his life, with no knowledge of the defect in his buckle and with no thought of a product liability lawsuit, told first responders that his seatbelt broke in the crash.  *See* Dunaway Depo, Ex. 8 at 20, 23-24.  Easterling testified that he is a habitual seatbelt user.  *See* Easterling Depo, Ex. 1 at 94.  Although Ford wishes to argue that Easterling was not wearing his seatbelt at the time of the crash, Ford's own expert identified evidence to support Easterling's testimony that his seatbelt use was both typical and consistent, and there is no credible evidence to criticize that conclusion.  *See* Cooper Depo, Ex. 7 at 77, 85.

Furthermore, there were multiple opportunities during the crash for the buckle to have been forced from the defective latch mechanism.  *See* Phillips Depo, Ex. 10 at 121, 125, 126.  Ford is, of course, now critical of Van Iderstine's testing of the RNS4G buckle and its defects, asserting that Van Iderstine's testing was performed under "false conditions that do not fit the facts of this case," although as described hereinabove, Ford did not undertake to cite even a fraction of the facts that lie outside the context of this assertion and countermand their argument.  *See* Def. Brief (Doc. 39) at 18.

For one thing, Ford's expert, Cooper, testified that Van Iderstine's inversion of the buckle to test the latch release defect was one such false condition, ignoring the testimony of Ford's other expert, Hoover, who testified that Easterling was *inverted* at least twice during the crash sequence, which comports neatly with testing performed by Van Iderstine that demonstrates an improper release of the buckle while inverted.  *See* Cooper Depo, Ex. 7 at 69; *see* Hoover Depo, Ex. 6 at 7, 21-22, 217.

This only highlights Ford's efforts to create in their motion a virtual laboratory of fallacy, criticizing distances of button travel measured in tenths, even hundredths of millimeters in service of an argument that Van Iderstine's testing was somehow invalid, when Van Iderstine expressly opined that there was nothing magical about where he set the button for testing and that no one could know in the real world precisely where Easterling's button sat in space as he entered the crash sequence.  *See* Def. Brief (Doc. 39) at 18; *see also* Van Iderstine Depo, Ex. 11 at 90-91.  Ford's argument in this regard is precisely the kind of "cherry-picking" of isolated facts and responses that Alabama courts prohibit in product liability cases, in favor of viewing the evidence as a whole. *GMC v. Jernigan*, 883 So. 2d 646, 665 (Ala. 2003).

What we know is that, viewed in a light resolving all doubts about Van Iderstine's testimony in favor of Easterling, this buckle was defective and could come unlatched with the application of light force while tricking its user into believing that it was, in fact, latched.  *See* Van Iderstine Depo, Ex. 5 at 77, 80-81, 141, 146; 141; *see also* Easterling Depo, Ex. 1 at 105; see also *Van Voorst v. Federal Exp. Corp.*, 16 So.

3d 86, 90 (Ala. 2008) (citing *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997))[6].  We also know that, in the real world outside of Ford's laboratory of fallacy, this crash was violent, occurring at speed, involving constant yaw, interaction with a rock wall, and, if Ford's expert is to be believed, at least 2.75 rolls.

The standard that should be applied for the purposes of this motion is that Van Iderstine is correct about the defective condition of the subject buckle.  See *Van Voorst v. Federal Exp. Corp.*, 16 So. 3d 86, 90 (Ala. 2008) (citing *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997)).  Applying that standard, and taking it into account along with Phillips' reconstruction testimony, Easterling's testimony and Ford's own reconstruction testimony, it is clear that the real-world violence of the subject crash presented numerous opportunities for a defective buckle latch that can be pulled out of its mechanism by hand to fail during the crash.

We also know in this case that Dr. Ponce, a UAB orthopedic surgeon who specializes in shoulder injuries and whose testimony is undisputed, noted that it is rare in his experience to see a patient with two (2) scapular fractures.  *See* Ponce Depo, Ex. 2 at 5, 63.  However, not only did Dr. Ponce opine that these injuries are rare and were produced by great force, he also opined that it is rare for a patient to survive such injuries.  *See* Ponce Depo, Ex. 2 at 63, 70.   This is important because Ford's

---

[6] In order to not repeat arguments and information regarding proof of defect and causation, Plaintiff also refers and incorporates herein by reference the arguments and information provided in his Opposition to Ford's Motion to Preclude the Testimony of Plaintiff's expert Donald Phillips.  Phillips' testimony and work on the issue of defect and how that defect can lead to a belt unlatching and whether this belt was worn in this accident by Easterling are all addressed in detail in Plaintiff's Opposition Brief to the Motion to Preclude.

biomechanical expert expressly concedes that if Easterling had been belted throughout the crash sequence, he would not have experienced the nature of injuries he experienced or the severity of injuries he experienced, rendering a critical part of the causal chain in this case unchallenged by Ford. *See* Marth Depo, Ex. 3 at 66. For the purpose of this motion, it is clear that Easterling has established that he would not have experienced the severe injuries he suffered if his seatbelt buckle had not failed.

The second part of the "alternative design" test requires Easterling to demonstrate that the usefulness of the alternative design outweighed the usefulness of the design used. See *GMC v. Jernigan*, 883 So. 2d 646, 669 (Ala. 2003) (citing *Hannah v. Gregg, Bland & Berry*, 840 So. 2d 839, 858 (Ala. 2002). Even Cooper, Ford's seatbelt expert, admits that a buckle with metal springs is a feasible alternate design for a seatbelt buckle. *See* Cooper Depo, Ex. 7 at 120-121. Every other buckle in the world at the time of this crash used metal button return springs, which is clearly a design that was widely available to Ford, and the "usefulness" of that design is that more robust button return springs that do not break would have prevented the failure of the subject buckle.

The usefulness of that design alternative as compared to the buckle design with the plastic springs that break and cause a latch release during a crash is apparent on its face. Ford's motion as to the availability of a practical, alternative design is due to be denied.

### III.  FORD AND TRW ACKNOWLEDGE THAT A NON-RETURNING HOME BUTTON IS INDICATIVE OF A BUCKLE THAT DOES NOT MEET FORD'S SPECIFICATIONS.

The standard for establishing a manufacturing defect under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") is that when a particular product, such as the TRW RNS4G belt buckle, has an unintended flaw or abnormality that renders it more dangerous than it would have been if it had been constructed as intended, then the product has a manufacturing defect.  See, e.g. *Interstate Engineering, Inc. v. Burnette*, 474 So. 2d 624, 628 (Ala. 1985).

Ford argues in this case that Donald Phillips' opinion on this subject is "garbled conjecture" based on the argument that Phillips "surmises" that the broken buckle springs may not meet Ford's material specifications, though Phillips testified that he did not know what those specifications were.[7]  Def. Brief (Doc. 39) at 17.  As it turns out from evidence later recovered from TRW directly, Phillips didn't need to know Ford's precise material specifications, and his testimony, far from being garbled, is on all fours with TRW's own guidance concerning this buckle.

In TRW's DFMEA, it states that "pushbutton must remain in full out position," and states that when "pushbutton does not remain in full out position," the buckle is in "potential failure mode."  DFMEA, Ex. 11.  The DFMEA acknowledges that the failure

---

[7] At the time Phillips was deposed, TRW had not produced any design drawings or specifications for the RNS4G buckle and Ford claimed it did not have this information as it was in the possession and control of TRW.

is potentially caused when "latch guide leaf springs have inadequate force to return pushbutton to full out position when latched." DFMEA, Ex. 11.

Furthermore, the potential effects of the failure were understood prior to this crash, as follows:

1)   "Occupant Not Restrained;"

2)   "No Latch;"

3)   "Partial Latch;"

**4)   "Non-Conformance to Federal Spec;" and**

**5)   "Non-Conformance to Customer Spec."**

DFMEA, Ex. 11. (emphasis added).

In other words, if the springs that exist to push the button into its correct, home position do not work, TRW understood that this could result in lots of unfortunate things, including the occupant losing the restraint, a "no latch" and a "partial latch," which describes the fault and its potential consequences in a way similar to what happened in this case. *See* DFMEA, Ex. 11.

However, TRW also stated that if the springs broke, it indicates both a non-conformance to the customer's (in this situation TRW's "customer" is Ford) specifications and a non-conformance to Federal specifications i.e. Federal Motor Vehicle Safety Standards. *See* DFMEA, Ex. 11.  TRW acknowledges that springs that return the button to its home location are not supposed to break, and that if they do

break, they do not conform with Ford's specifications as TRW's customer. *See* DFMEA, Ex. 11.

For these purposes, it does not matter what the precise specifications were, nor does it matter precisely when the springs failed. According to TRW, if the springs break, they do not meet Ford's specifications for the buckle. The Plaintiff has presented ample testimony and evidence that there is a defect in the buckle's button return springs, and the documented admission that broken springs do not meet Ford "specs" is substantial evidence of a flaw in this product, which is the key requirement to proving a manufacturing defect.

## IV.   EASTERLING HAS PRESENTED SUBSTANTIAL EVIDENCE OF BREACH OF WARRANTY.

Ala. Code § 7-2-314 and Ala. Code § 7-2-315 (1975) adopt the Uniform Commercial Code's implied warranties of merchantability and fitness for a particular purpose, respectively. Traditionally, a plaintiff's ability to recover under breach of warranty theories was restricted by a pre-suit notice requirement and a privity-of-contract requirement; however, those requirements have been stripped from the elements of implied warranty claims in personal injury product liability cases. *See* Ala. Code § 7-2-318 (extending the benefit of implied warranties to "any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty); see also *Simmons v. Clemco*

*Industries*, 368 So. 2d 509 (Ala. 1979) (abrogating the requirement of an injured person to notify the manufacturer or seller of a breach of implied or express warranties).

The *sole argument* advanced by Ford pertaining to warranties in this case is that the Plaintiff has not proven a defect that proximately caused his injuries.  *See* Def. Brief (Doc. 39) at 20.  Ford makes no argument related to any element of either implied warranty pled by the Plaintiff, and both the causation and defect arguments are addressed elsewhere in this brief.  If the Court finds that the Plaintiff has established a defect and proven causation by substantial evidence, the Plaintiff's warranty claims are thus due to prevail on summary judgment.

## V.     FORD KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF THE DEFECT AND FAILED TO ADEQUATELY WARN OF ITS EXISTENCE, AND BOTH THE PLAINTIFF'S FAILURE-TO-WARN CLAIMS AND WANTONNESS CLAIMS SHOULD ADVANCE.

There are two issues in this regard.  First, the Plaintiff's testimony and Van Iderstine's testimony demonstrate that although the subject buckle is in a compromised and malfunctioning condition, a typical consumer will hear an "audible click" and the buckle will accept a latch plate, thus creating a reasonable belief on the part of the consumer that the buckle remains properly functional.  *See* Van Iderstine Depo, Ex. 5 at 141-143, 146; *see also* Easterling Depo, Ex. 1 at 105.  Therefore, even though the buckle's performance is compromised, a typical consumer, including Easterling, would not be aware of that fact.

On the other hand, Ford was aware for years prior to this incident that there were latching issues directly related to the release button not returning home on the TRW RNS4G buckle, and was aware after the product recall that similar issues continued, though they chalked the cause of those issues up to contamination and damage to internal parts caused by contamination.  *See* Ex. 12; *see also* Ex. 13; *see also* Clement Depo, Ex. 14 at 64-67.

When a manufacturer knows that a product may be dangerous when used in a reasonably foreseeable manner, then the manufacturer has a duty to issue adequate warnings.  See *Richards v. Michelin Tire Corp.*, 21 F. 3d 1048, 1058 (11th Cir. (Ala.) 1994).  To establish a failure to warn claim under the AEMLD, the Plaintiff must prove that Ford knew or should have known that the buckle could create a danger when used as intended, that any warning provided by Ford was inadequate and that the breach of these duties caused the Plaintiff's injuries.  See *Campbell v. Robert Bosch Power Tool Corp.*, 795 F. Supp. 1093, 1097 (M.D. Ala. 1992).

In this case, Ford clearly had a reason to know that the buckle creates a danger when a consumer inserts the latch as intended, perhaps even more so because of the insidious nature of the fault and Ford's lopsided knowledge of pushbutton faults with the RNS4G buckle.  Ford issued no warnings of any kind, and the fact that pushbutton-related faults continued after the recall without additional recalls or warnings to consumers is itself strong evidence that Ford possessed knowledge that it should have

passed along to consumers like Easterling, who are led to believe that when they insert the latch and click their buckle, it will perform appropriately.

Both the Plaintiff's failure-to-warn allegations and wantonness allegations arise from the same evidence of Ford's knowledge of the pushbutton faults with the RNS4G buckle, Ford's knowledge that the faults with the buckle continued after the recall and Ford's failure to pass that information along to consumers.  For these reasons, both the failure-to-warn claims and wantonness claims should be submitted to the jury.

### Conclusion

For the foregoing reasons, Plaintiff Jerry Easterling respectfully requests that the Court DENY Ford's Motion for Summary Judgment.

**DATED:**        This the 8th day of January, 2018.

                                   */s/ Andrew J. Moak*
                                   Andrew J. Moak
                                   Craig P. Niedenthal
                                   State Bar No.:  ASB-3266-N66M
                                   SHUNNARAH INJURY LAWYERS
                                   2900 1st Avenue South
                                   Birmingham, Alabama 35233
                                   P 205.983.8163
                                   F 205.983.8463
                                   amoak@asilpc.com
                                   cniedenthal@asilpc.com
                                   Attorneys for the Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date provided the following with a copy of the foregoing via the *CM/ECF* system:

D. Alan Thomas
Paul F. Malek
Douglas Carmichael
Huie, Fernambucq & Stewart, LLP
Three Protective Center – Ste. 200
2801 Highway 280 South
Birmingham, Alabama 35223
P 205.251.1193
F 205.251.1256
athomas@huielaw.com
pmalek@huielaw.com

Melody H Eagan
LIGHTFOOT FRANKLIN & WHITE LLC
400 20 Street North
Birmingham, AL 35203
205-581-0700
205-581-0799 (fax)
meagan@lightfootlaw.com


/s/ *Andrew J. Moak*
OF COUNSEL