# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JERRY W. EASTERLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-02353-JEO |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is a product liability case arising out of a motor vehicle accident. Plaintiff Jerry Easterling has sued defendant Ford Motor Company for injuries he sustained when he lost control of his 2003 Ford F-250 pickup truck and crashed. He alleges that he was wearing his seat belt at the time of the accident and that the seat belt buckle unlatched during the crash sequence due to a defect in its design and manufacture.

The case is now before the court on three related motions filed by Ford: (1) Ford's motion for summary judgment (doc. 38); (2) Ford's motion to exclude the opinions that have been offered by Easterling's designated expert witness on product defect, Donald R. Phillips, P.E.[1] (doc. 40); and (3) Ford's motion to strike Phillips's "newly disclosed" expert opinion and any related testing performed in

---

[1] Easterling also retained Phillips to reconstruct the accident. Ford has not moved to exclude Phillips's accident reconstruction opinions.

support of the opinion (doc. 89).  The court held a hearing on the motion to exclude Phillips's opinions on January 30, 2018.  Phillips testified at the hearing, as did Easterling's other expert witness, Eric Van Iderstine.  Following the hearing, Ford filed its motion to exclude Phillips's "newly disclosed" opinion and any testing performed in support thereof.

All three of the pending motions have been fully briefed by the parties and are ripe for decision.   Because the court's rulings on Ford's motion to exclude Phillips's opinions and motion to strike his "newly disclosed" opinion and related testing will impact the court's decision on Ford's motion for summary judgment, the court will consider the motion to exclude and motion to strike first, and will then address the motion for summary judgment.  For the reasons discussed below, the court concludes that all three motions are due to be granted.

## FACTS

### A.    The Accident

On the morning of December 30, 2012, Easterling was driving his 2003 Ford F-250 pickup truck on a two-lane road in Bessemer, Alabama.  He hit a patch of ice and lost control of the vehicle.  His truck veered off the right shoulder of the road, struck an embankment, crossed back over the road, and struck a ditch.  The truck then rotated and turned over on the driver's side, where it came to rest. (Ala.

Uniform Traffic Accident Report).[2]  Easterling sustained multiple serious injuries in the accident.

According to Easterling, he is a habitual seat belt user and was wearing his seat belt at the time of the accident.[3]  However, at some point during the crash the seat belt buckle unlatched.  (Deposition of Jerry Easterling at 94, 106-07).[4] Easterling contends that his injuries would not have been as serious if the seat belt buckle had remained latched throughout the entire crash sequence.

## B.  The Seat Belt Buckle

The driver's seat belt buckle in Easterling's 2003 Ford F-250 pickup truck was part of a three-point restraint system manufactured by TRW Vehicle Safety Systems, Inc.[5]  The buckle is identified as the TRW "RNS4G" buckle.  Eric Van Iderstine, a professional engineer who performed CT scans of the buckle, provided a detailed description of the buckle assembly:

> The design of the seat belt buckle assembly in the 2003 Ford F-250 utilizes a metal frame with a plastic cover …. The buckle cover has an opening that allows the latch plate to be inserted.  When inserted, the

[2] The traffic accident report is located at Doc. 42-1.

[3] Ford disputes that Easterling was wearing his seat belt, but this disputed issue of fact is not material to the present motions.

[4] The Deposition of Jerry Easterling is located at Doc. 84-1.

[5] The restraint system includes a retractor, an adjustable guide loop, a single-slot sliding latch plate on the webbing, and a buckle and stalk assembly.  The guide loop and retractor are mounted to the truck's B-pillar and the buckle and stalk assembly are mounted to the seat. (Report of Eddie R. Cooper dated Oct. 10, 2016 at 2).  Cooper's report is located at Doc. 84-23.

latch plate slides in between surfaces of the metal frame. The latch plate depresses a spring loaded ejector that is intended to eject an improperly seated latch plate to prevent a "false latch" condition. Once the latch plate is inserted, a spring loaded lock bar passes through a cutout in the latch plate and in each side of the buckle frame. The lock bar is held in place by the metal latch spring …. The latch spring is affixed to the buckle button and is deflected away from the lock bar when the button is depressed. The metal latch spring is deflected away from the lock bar by a slide surface on a white plastic assembly riveted to the buckle frame. The white plastic assembly incorporates two cantilevered springs that return the buckle button to its fully returned, initial position. The buckle button has angled ramp-type features molded into the buckle button. The angled ramp-type features are used to move the lock bar out of position as the buckle button is depressed. The buckle button also has backing tab features that move behind a fully seated lock bar when the button is fully returned to prevent the lock bar from moving out of position.

(Report of Eric L. Van Iderstine dated Aug. 9, 2016 at 2-3).[6]

Van Iderstine's initial CT scan of the subject buckle revealed that the two plastic (polymer) return springs for the buckle button were fractured and "failed to contact the buckle button, precluding the spring operation and button return." (*Id.* at 3). A subsequent scan of the buckle with the latch plate inserted also revealed that the fractured springs were "not in contact with their mating features on the buckle button … and not capable of fully returning the buckle button." (Supplemental Report of Eric L. Van Iderstine dated Sept. 27, 2016 at 2).[7]

---

[6] Van Iderstine's report is located at Doc. 42-7.

[7] Van Iderstine's supplemental report is located at Doc. 42-8.

Van Iderstine also conducted a series of tests to determine whether a seat belt buckle can unlatch if the release button is in a partially depressed position. Van Iderstine initially evaluated two "exemplar buckles" using a fixture that allowed the button to be depressed in a repeatable manner. The evaluations revealed that "the condition of a partially depressed buckle button can result in the unintended unlatching and release of the latch plate." (Van Iderstine Report at 6). Van Iderstine subsequently tested the subject buckle with the release button depressed 2.9 mm below the buckle cover. The testing "demonstrated that the buckle functionality is compromised due to the buckle not fully returning. … Pulling by hand on the latch plate and seat belt webbing resulted in the release of the latch plate from the buckle[.]" (Van Iderstine Supp. Report at 3).

## C. Donald Phillips's Opinions

Easterling's claims against Ford are based on the contention that his seat belt buckle unintentionally unlatched during the crash of his vehicle due to a defect in the buckle's design and manufacture. He has designated Donald Phillips, P.E., as his expert witness on product defect. Phillips, a mechanical engineer, has opined that "due to the cracked defective seat belt buckle release button plastic return springs the seat belt became inadvertently released and resulted in serious personal injury to Mr. Easterling." (Report of Donald R. Phillips dated Aug. 10, 2016 at

14).[8]  More specifically, Phillips has opined that because the cracked return springs were "no longer providing adequate return force to the release button," the release button "fail[ed] to return to a full 'up' position," which in turn "result[ed] in the release ramp of the button design to come in close contact with the lock bar of the buckle frame resulting in less than full engagement of the lock bar and … allowing for [the] buckle to inadvertently release the latch plate causing the driver to be ejected from a fully belted position." (*Id.* at 8-9).

Phillips has also expressed the opinion that "steel coil" release button return springs are more "robust" and resistant to "cyclical fatigue" and "aging" than plastic return springs. (Phillips Report at 6-7).  He asserts that Ford knew or should have known that steel coil return springs have been used in other manufacturers' buckle designs and that Ford placed Easterling "at risk for increased injuries in crashes" by failing to utilize such an alternative design. (*Id.* at 7, 14).

Lastly, Phillips has opined that Ford "should have warned or recalled the 2003 Ford F-250 Super Duty pickup trucks due to failed or failing seat belt buckle release button plastic return springs." (*Id.* at 14).  At his deposition, Phillips clarified that he is not offering an opinion "on how to design a warning to tell consumers that they have cracked return springs." (Deposition of Donald R.

---

[8] Phillips's report is located at Doc. 42-4.

Phillips at 253).[9]  Rather, it is his opinion that Ford should have "alert[ed] the public through either a disclosure [(a technical service bulletin)] or a recall saying, 'We have discovered this issue with our seat belt buckles.  We need to have them brought in and checked for cracked return springs.'" (*Id.* at 253-54).

## MOTION TO EXCLUDE PHILLIPS'S OPINIONS

Ford has moved to exclude Phillips's defect, causation, and failure-to-warn opinions under FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[10]  (Doc. 40).  Rule 702 controls the admission of expert testimony in the federal courts.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

---

[9] The Deposition of Donald R. Phillips is located at Doc. 84-10.

[10] Ford also argues, separately, that Phillips's opinions would likely confuse the jury and should be excluded under FED. R. EVID. 403.  For the reasons discussed below, the court has determined that Phillips's opinions are inadmissible and due to be excluded under Rule 702 and *Daubert*.  Therefore, the court will pretermit any consideration of Ford's separate argument under Rule 403.

In *Daubert*, the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." 509 U.S. at 589 & n.7. The Court later clarified that this function applies to all expert testimony under Rule 702, not just "scientific" testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire*, 526 U.S. at 152).

In determining the admissibility of expert testimony, the court is to "engage in a rigorous three-part inquiry," considering

> whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). While there is "some overlap" among these requirements, "they remain distinct concepts and the courts must take care not to

conflate them." *Id.* The proponent of expert testimony bears the burden at trial to establish these elements of admissibility. *Id.* However, a party moving under *Daubert* to preclude testimony by its opponent's expert must first make a threshold showing sufficient to indicate that its adversary will be unable to meet its burden at trial with regard to the testimony. *See Gottstein v. Flying J, Inc.*, 2001 WL 36102297, at *1 (N.D. Ala. Aug. 22, 2001); *cf. Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (recognizing that, even where a party has the burden of proof at trial, that party need not produce proof supporting his claim in response to a motion for summary judgment unless the movant has first presented evidence that would negate an element of the non-movant's claim or indicates that the non-movant will be unable to meet his burden at trial; "it is never enough simply to state that the non-moving party cannot meet its burden at trial").

As to the first element, the Eleventh Circuit has recognized that "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260-61. "Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Id.* at 1261. Rather, "while an expert's overwhelming qualifications may bear on the reliability of his proffered

testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." *Id.* (quoting *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341-42 (11th Cir. 2003)).

Turning to the second requirement, the trial judge must evaluate the reliability of expert opinion by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93). In this inquiry, courts generally consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (quoting *Quiet Tech.*, 326 F.3d at 1341). However, "these factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.* "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Id.* (emphasis in original).

As to the third requirement, the Eleventh Circuit has stated that expert testimony must "assist the trier of fact" by shedding light on matters "that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citing *United States v. Ruoco*, 765 F.2d 983, 985 (11th Cir. 1985)). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

While undertaking these analyses, however, it must be kept in mind that "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001), quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)); *see also Adams v. Laboratory Corp. of Amer.*, 760 F.3d 1322, 1334 (11th Cir. 2014); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson Cnty., Ala.*, 837 F.2d 1036, 1042 (11th Cir. 1988). Accordingly, while the court must determine that expert testimony is sufficiently

reliable to be admissible, once it has done so "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology*, 326 F.3d at 1341; *see also 0.161 Acres of Land*, 837 F.2d at 1040-41 ("Importantly, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion.").

Here, Ford argues that Phillips's opinions are inadmissible under Rule 702 and *Daubert* because (1) he is not qualified to offer the opinions, (2) his opinions are not reliable, and (3) his opinions do not "fit" the facts of the case. Easterling responds that Phillips is qualified to offer his opinions and that his opinions are both reliable and relevant.

## A.    Qualifications

Phillips's product defect theory is that the subject seat belt buckle unlatched during the crash of Easterling's vehicle because the buckle's "cracked defective" plastic release button return springs did not produce adequate force to return the button to its full "up" position, which allowed for the inadvertent release of the latch plate during the crash. He has proposed steel coil return springs as a reasonably safe alternative design, proclaiming steel coil springs to be more "robust."

Ford argues that Phillips is not qualified to offer any of his opinions because he has never designed a seat belt for production, is not a materials engineer or chemist, and has no specialized experience in plastics or polymers. (Doc. 41 at 17-18). Indeed, Phillips admitted the following at his *Daubert* hearing:

Q.    … [F]or the latch assist return springs that we have in this case, you have never designed one of those?

A.    No, sir, I haven't.

Q.    You've never, as part of your professional career, had to determine what the specifications would be for those return springs?

Q.    That's correct.

Q.    You've never had, as part of your career, an issue about analyzing what the material composition is for those return springs.

A.    That's correct.

(Doc. 102 at 26-27). Phillips also admitted that he has never designed "any part" of a seat belt, including the buckle, latch plate, webbing, retractor, or pretensioner. (*Id.* at 58).

Easterling counters that Phillips is a licensed professional engineer in seven states and worked for several years at Breed Automotive, a manufacturer of seat belts and air bags. (Doc. 84 at 17). Phillips testified at the hearing that although his focus at Breed was on airbags, his work included the interaction of airbags with seat belt systems. (Doc. 102 at 9, 124). Phillips also testified that he looked at and

addressed the use of various types of springs in airbag systems, including metal springs and polymer springs, when he worked at Breed. (*Id.* at 124-25). He further testified that he has analyzed about a thousand automotive accidents in his capacity as a consulting engineer and has testified as an expert in approximately 27 trials specifically involving claims of seat belt defects and/or seat belt performance. (*Id.* at 23, 122). In none of those 27 trials was his testimony excluded or limited. (*Id.* at 122-23).

Whether Phillips is qualified to offer his opinions in this case is a close question. On the one hand he is not a materials engineer and has no experience in the design of seat belt buckles or release button return springs. On the other hand he does have extensive experience analyzing automotive accidents and how seat belts work as part of an integrated vehicle safety system. While the court might lean towards finding Phillips not qualified, ultimately the court need not make such a finding, because the court is otherwise convinced that Phillips's opinions are not reliable. For the reasons discussed below, Phillips's opinions are due to be excluded as unreliable, even assuming that he is qualified to offer the opinions.

**B.    Reliability**

Ford argues that Phillips's opinions are unreliable because he has summarily declared the buckle's fractured plastic return springs to be defective, and summarily declared steel coil springs to be a more robust design, without providing

any testing or other data to support his assertions. Ford argues that without such supporting data, Phillips's opinions are unreliable. The court agrees with Ford.

At his *Daubert* hearing, Phillips confirmed that he is critical of the use of polymer (plastic) return springs in the subject buckle. (Doc. 102 at 28). He conceded, however, that he has made no attempt to study the polymer composition or properties of the return springs, cannot tell what caused the springs to break, and does not know why they failed. (*Id.* at 27, 41-43). He maintained that he "[didn't] need to know what [the springs were] made of once he recognize[d] the fact that they broke—they fractured and they failed." (*Id.* at 28).

Similarly, Phillips confirmed that his "design issue" is that the buckle design should have utilized "a metal coil [return] spring instead of a plastic cantilever spring." (*Id.* at 40). He admitted, however, that he has not done the work that would be necessary for him to identify a reasonably safe alternative design incorporating a metal coil return spring:

> Q. … You can't point to a buckle that you can tell this Court and say, in Don Phillips's opinion, this would be a reasonably safe alternative design in all aspects?
>
> A. That would be true … I would have to go out and do a survey, find [a buckle] that was used with a pretensioner that had a metal coil return spring, and then say, here you go, this is it.
>
> Q. And you haven't done that in this case—that work in this case?
>
> A. Not yet.

(*Id.* at 57-58).  Likewise, although Phillips testified that his alternative design would utilize metal coil return springs made of "the same type of metal that was used for the [buckle's] latch plate ejector spring," he does not know what type of metal was used for the ejector spring and has not done the "studies" to determine what the size of the metal coil return springs should be or what their spring rate should be.  (*Id.* at 68-70, 149).  He testified that "the concept is there" but that he could not provide the "specifics" regarding spring rate and size "without extensive further work." (*Id.* at 149).

Phillips also testified that "there's a possibility that a manufacturing defect exists" because the return springs in the subject buckle failed without meeting TRW's requirement that return springs last for 75,000 cycles. (*Id.* at 34, 40-41).  Again, however, he admitted that he does not know why the springs did not meet the 75,000 cycle requirement and does not know why the springs failed. (*Id.* at 41-42).

The court also notes that the only "testing" that was performed by Easterling's experts was the series of tests performed by Van Iderstine to determine whether a seat belt buckle can unlatch if the release button is in a partially depressed position.  Neither Phillips nor Van Iderstine performed any testing, or presented any data or analysis, relating to the life span or failure rate of release button return springs, whether made of plastic or metal.

In light of the above gaps in Phillips's testing and methodology, his opinions are not sufficiently reliable to be admissible. The underlying premise of all of his opinions is that the release button return springs in the subject buckle were defective, but he has done little more than note that the springs were made of plastic, they fractured at some unidentified point in time and failed, and other buckle designs utilize metal springs. He cannot say, and has done no testing to determine, what caused the springs to fracture or why they failed. He has not analyzed the material properties of the springs or performed any testing to determine their durability. He has performed no testing and provided no data or studies comparing the performance or relative strengths of plastic springs versus metal springs. He has not identified a reasonably safe alternative design utilizing metal return springs, although he claims that he could if he did further work. He has simply declared the plastic return springs to be defective because they fractured and failed. That is not enough to satisfy the reliability requirement of Rule 702 and *Daubert*. *See Daubert*, 509 U.S. at 590 (noting that an expert's opinion must rest on "appropriate validation" and must be more than "belief or unsupported speculation"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *see also Zaremba v. General Motors Co.*, 360 F.3d 355, 359

(2d Cir. 2004) (excluding Phillips's defect and alternative design opinions as unreliable where he offered "no test results, models, calculations, or drawings" to demonstrate that his alternative design would have "resulted in greater safety in the rollover accident at issue"); *In re Ford Tailgate Litigation*, Case No. 11-cv-02953-RS, Order Granting Motions to Exclude Expert Testimony at 15 (N.D. Ca. Nov. 25, 2015)[11] (excluding Phillips's opinions in litigation involving allegedly defective tailgate latch systems, where Phillips "[did] not back up his opinions with reference to any meaningful testing, literature, or comparisons").

Easterling's opposition to Ford's motion to exclude Phillips's opinions largely ignores Phillips's failure to provide any test results or other data to support his contention that the buckle's plastic return springs were defective. Instead, Easterling focuses on the methodology Phillips employed in reaching his opinion that "the fractured return springs could result in an unintentional and inadvertent unlatching of the belt thus confirming the unreasonably dangerous condition of the subject buckle." (Doc. 84 at 23). Easterling argues that "[f]or purposes of being able to address whether this buckle was fit for its intended purpose, it is not necessary [that Phillips] be able to address how strong the springs are and when and why they broke." (*Id.* at 16). Easterling asserts that the relevant issue is

---

[11] A copy of the Exclusion Order is located at Doc. 41-1.

"whether this seat belt was unreasonabl[y] dangerous with broken button return springs." (*Id.* at 23).

Easterling's argument ignores settled Alabama law. In this product liability case against Ford, Easterling's burden as plaintiff is not to prove that his seat belt was unreasonably dangerous with a broken component part, but rather to prove that the seat belt was defective and unreasonably dangerous when it left Ford's possession, without substantial change in the product's condition. *See Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 132-33 (Ala. 1976); *Atkins v. General Motors Corp.*, 642 So. 2d 134, 141 (Ala. 1994); *Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 995 (Ala. 1981). "[T]he failure of a product does not presuppose the existence of a defect. … [A] defect in the product must be affirmatively shown." *Townsend v. General Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994). As Easterling's expert on product defect, Phillips must do more than simply declare the seat belt to be "defective" because the buckle's plastic return springs fractured and failed at some point in time post-sale.

Easterling also dismisses Ford's argument that Phillips has not adequately supported his opinion that metal return springs are a superior alternative design to plastic return springs, calling Ford's argument "curious" given that Ford's own expert, Eddie Cooper, testified that the TRW RNS4G buckle was the only buckle utilizing plastic return springs during the 2000 to 2010 timeframe. (Doc. 84 at 25).

Easterling contends that "the state of the art in the 2000s was to use metal return springs as Phillips has opined." (*Id.*) That may be the case, but the mere fact that all other buckles utilized metal return springs does not, in and of itself, establish that a design utilizing plastic return springs was inferior or defective. Again, Phillips has not provided any test results, studies, or other data comparing the durability, relative strengths, and failure rates of plastic springs versus metal springs.

Easterling also points to an internal TRW Design Failure Mode and Effects Analysis ("DFMEA") document indicating that "a push button not returning to home can be caused by broken return springs, with the potential effect[s] being 'occupant not restrained', 'no latch' or 'partial latch'." (Doc. 84 at 24). Easterling asserts that the DFMEA document "confirm[s]" Van Iderstine's findings—on which Phillips relies—that the subject buckle's broken return springs could result in an inadvertent unlatching of the buckle. (*Id.* at 24-25). Easterling overstates the significance of the DFMEA document. The DFMEA document may establish TRW's recognition that broken return springs could result in an inadvertent unlatching of the buckle, but it sheds no light on the underlying issue of why the plastic return springs in the subject buckle broke in the first place. Even with the DFMEA document, Phillips still has provided no test results or other data regarding the strength of the plastic return springs or why they broke. The

DFMEA document is consistent with Van Iderstine's findings, but it does not plug the hole in Phillips's opinions.

The court recognizes that it may be Easterling's position that it is not necessary for Phillips to address the strength of the plastic return springs or why they broke because the design defect he has identified is ***not*** the propensity for plastic return springs to break. Rather, as Phillips testified at the hearing, "it's unreasonably dangerous to use a plastic spring that can fail in a concealed manner to render the seat belt ineffective in a crash, which is backed by TRW's own documents." (Doc. 102 at 54). In other words, it does not matter why the return springs fractured and failed; what matters, and what renders the buckle defective, is the concealed nature of the failure and the resulting hidden danger of a buckle that may unlatch during a crash.

Even construing Phillips's defect opinion in this way, his opinion is still unreliable, and perhaps even more so. If it is Phillips's opinion that the subject buckle was defective because it utilized a plastic return spring that could fail in a concealed manner and render the buckle ineffective in a crash, Phillips has not identified an alternative design that remedies this alleged defect. He has not identified an alternative buckle design that (1) alerts the seat belt user if the button return springs—whether made of plastic or metal—fail, (2) ensures the button will return to its full "up" position even if the return springs fail, or (3) prevents the

buckle from operating at all if the return springs fail.  Likewise, he has done no testing and provided no studies showing that if metal coil springs had been used instead of plastic springs, they would have failed in an open and obvious way such that the user would be on notice of the buckle's compromised condition.  And if it is Phillips's contention that metal springs would not have failed, then he is back at square one—he has provided no test results, studies, or data comparing the relative strengths and failure rates of plastic springs versus metal springs.

Finally, to the extent Phillips has offered a separate "warning" opinion, the opinion fares no better than his defect opinion.  Indeed, Phillips's warning opinion is premised on his defect theory.  As previously noted, Phillips's warning opinion is that Ford should have alerted the public about the "failed or failing seat belt buckle release button plastic return springs" in 2003 F-250 pickup trucks through either a technical service bulletin or a vehicle recall.  Although Easterling argues that the "essence" of Phillips's warning opinion is that Ford "should have made all owners of vehicle[s] with this RNS4G buckle [aware] that if the button was not returning to its full home position, [they] need[ed] to have [the] buckle replaced or at the least inspected by a dealer" (doc. 84 at 29), the opinion still emanates from Phillips's baseline defect theory—namely, that the "cracked defective" plastic return springs did not provide adequate force to return the button to its home position.  Whether expressed as a defect opinion or a warning opinion, the true

"essence" of Phillips's opinions is that the buckle was defective because it utilized plastic return springs that cracked and failed. As discussed above, Phillips simply has not done the testing or provided the research to support such an opinion. Without such supporting evidence, all of his opinions are unreliable and inadmissible.

## C.    Fit and Relevance

Ford argues that Phillips's "causation-related" opinion—his opinion that Easterling's seat belt buckle unlatched during the crash sequence because the release button had not returned to its full "up" position due to the inadequate return force supplied by the cracked return springs—should be excluded for the additional reason that it does not "fit" the facts of the case. Ford argues that Phillips's opinion "rises and falls upon tests conducted by Van Iderstine that are divorced from the facts and physical evidence." (Doc. 41 at 23). Specifically, Ford argues that when Van Iderstine performed his tests to determine if a seat belt buckle can unlatch if the release button is in a partially depressed position, he never tested the subject buckle with the latch plate engaged and the button depressed to a level 1.72 mm below the buckle cover, the measured level when the buckle was latched and CT scanned. (Doc. 88 at 10). Instead, Van Iderstine tested the buckle with the button depressed 2.9 mm below the buckle cover, "well below the documented button position when the buckle and latch plate are engaged." (*Id.*) Ford argues

that because Phillips relied upon Van Iderstine's "contrived" testing to support his causation opinion, his opinion is irrelevant and inadmissible. (*Id.* at 11).

Easterling responds that Van Iderstine's testing was "not an exhaustive study to find the threshold" where a partially depressed button would result in unlatching of the buckle, but rather was "to show that a button that did not return to its home position could result in unlatching of the buckle." (Doc. 84 at 27-28). Easterling also notes that "all the experts agree … that the position of the button and the measurement taken the one time the subject buckle was latched and a CT done (the 1.72 mm measurement) is not indicative of the position the button will return to each time it is latched. … It could be more, it could be less." (*Id.* at 28) (emphasis omitted).

Because the court has determined above that all of Phillips's opinions, including his causation opinion, are unreliable and inadmissible, the court need not decide whether Phillips's causation opinion is also irrelevant. Regardless of whether Phillips's causation opinion does or does not fit the facts of the case, the opinion is due to be excluded as unreliable. The court does note, parenthetically, that it would likely find Van Iderstine's testing to be relevant to show that a buckle with a partially depressed button could result in the unlatching of the buckle, but not to show that the subject button was depressed to a level that would allow

unlatching at the time of Easterling's crash. However, the court does not make

such a finding here.

## MOTION TO STRIKE PHILLIPS'S "NEWLY DISCLOSED" OPINION
## AND RELATED TESTING

In response to Ford's motion for summary judgment, Easterling submitted

affidavits executed by Phillips and Van Iderstine. (Docs. 86-1 & 86-2). Phillips

executed his affidavit on January 4, 2018, and Van Iderstine executed his affidavit

on January 8, 2018.

In Phillips's affidavit, he expressed the following opinion:

When the push button is depressed to a depth where the primary locks
are no longer in contact with the lock bar, the amount of force to push
the lock bar out of the latch plate is between 9.4 to 20 ounces of force
(2.6N to 5.6N). The 9.4 ounce lower limit was determined with the
latch plate slightly depressed, and the 20 ounce upper limit was
determined with the latch plate in normal contact with the lock bar
while the push button was depressed to bypass the primary lock
molded into the push button simulating a cracked return spring.

(Doc. 86-1 at ¶ 8(11)). This opinion was not expressed in either of his prior expert

reports. At the *Daubert* hearing on January 30, 2018, Phillips revealed that his

new opinion was based on measurements performed by Van Iderstine earlier that

month. (Doc. 102 at 72-73).

Ford has moved to strike Phillips's new opinion, and any related testing on

which the opinion is based, as untimely. (Doc. 89). Ford notes that Easterling

submitted Phillips's original expert report on August 10, 2016, and his

supplemental report on September 28, 2016.  Ford deposed Phillips the following

week.  Then, on January 31, 2017, after discovery had closed and in compliance

with the court's Scheduling Order (as amended), Ford filed its motion for summary

and related motion to exclude Phillips's opinions.  Nearly one year later, following

an extended dispute between Easterling and TRW regarding a non-party subpoena

that Easterling had served on TRW, Easterling submitted Phillips's affidavit setting

forth his new opinion on the force required to push the buckle's lock bar out of the

latch plate, based on the recent measurements performed by Van Iderstine.  Ford

notes that it has not received "any records, photographs, or other documentation

relating to such testing," which it "had no idea" had been performed prior to the

*Daubert* hearing. (*Id.* at ¶ 5).

The court agrees with Ford that Phillips's new opinion, and the underlying

measurements/testing performed by Van Iderstine, should be stricken as untimely.

It would be unduly prejudicial to Ford to permit Easterling to offer and rely on a

new expert opinion long after both parties' experts have been deposed, discovery

has closed, and *Daubert* challenges have been raised.  To the extent Easterling

argues that the "evaluation" conducted by Van Iderstine "could not be performed

until the necessary specifications and drawings were produced by TRW to

determine the specifications for the latch spring so there would be documented

information from the manufacturer of the buckle to compare the results to confirm

the correctness of the results," the court is not impressed. (Doc. 92 at ¶ 2). TRW's lock bar spring specifications were not necessary for either Van Iderstine or Phillips to measure the force required to overcome the latch spring. Indeed, Van Iderstine admitted at the *Daubert* hearing that he could have measured the force at any time prior to receiving the TRW documents. (Doc. 102 at 187). The court is similarly unimpressed with Easterling's observation that there was "no inquiry" by either Ford or the court "as to whether new, additional or supportive opinions had been developed by [his] experts because of TRW's production." (Doc. 92 at ¶ 5). It was neither Ford's nor this court's obligation to make such an inquiry.

Accordingly, Ford's motion to strike Phillips's new opinion (as expressed in paragraph 8(11) of his affidavit) and any related testing will be granted.

## MOTION FOR SUMMARY JUDGMENT

Having determined that Phillips's opinions are inadmissible, the court turns to Ford's motion for summary judgment. (Doc. 38). Easterling's complaint against Ford contains four clams: a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"); a claim for negligent "design, manufacture, testing, warnings, inspection, distribution and/or sale" of Easterling's truck; a claim for wanton "design, manufacture, testing, warnings, inspection, distribution and/or sale" of the truck; and a claim for breach of implied warranty. (Doc. 1).

Ford has moved for summary judgment on all four claims.  For the reasons

discussed below, Ford's motion is due to be granted in its entirety.

## A.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion," relying on

submissions "which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark*

*v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the

nonmoving party must "go beyond the pleadings" and show that there is a genuine

issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court views the evidence in the light most

favorable to the non-movant.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844,

848 (11th Cir. 2000).  The court must credit the evidence of the non-movant and

draw all justifiable inferences in the non-movant's favor. *Id*.  Inferences in favor of

the non-movant are not unqualified, however.  "[A]n inference is not reasonable if

it is only a guess or a possibility, for such an inference is not based on the

evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## B.    Product Defect Claims

### 1.    Tort Claims

Ford argues that Easterling's AEMLD claim and his "other tort claims" based on product defect all fail because Easterling has not met his burden of showing that the subject product—the seat belt buckle in Easterling's F-250 pickup truck—was defective through admissible expert testimony. (Doc. 39 at 10-14). The court agrees with Ford.

A "defect" in a product has long been defined in Alabama as "that which renders a product 'unreasonably dangerous,' i.e. not fit for its intended purpose," and a "defective" product is one that "does not meet the reasonable expectations of a consumer as to its safety." *Casrell*, 395 So. 2d at 133. "[D]efective condition applies when, at the time the product leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer." *Id.* "The plaintiff bears the burden of proving that the product was in a defective condition when it left the defendant's control. Without evidence to support the conclusion that the product was defective

and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained." *Jordan v. General Motors Corp.*, 581 So. 2d 835, 837 (Ala. 1991).

As Easterling concedes, "expert testimony is required to establish substantial evidence of a defect in a complex product liability case" such as the case at bar. (Doc. 85 at 22). *See Haven Hills*, 395 So. 2d at 995 ("[O]rdinarily, expert testimony is required [to prove an alleged defect] because of the complex and technical nature of the commodity."); *see also Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328, 1333 (Ala. 1991) (stating that an automobile brake system is "precisely the type of complex and technical commodity that would require expert testimony to prove an alleged defect"). To meet his burden, Easterling has offered the testimony and opinions of Donald Phillips, his designated expert on product defect. The court, however, has determined that Phillips's opinions are unreliable and inadmissible and has granted Ford's motion to exclude the opinions. That ruling is fatal to Easterling's product defect claims. Without Phillips's expert testimony, Easterling cannot present substantial evidence to support his defect claims, whether asserted under the AEMLD, negligence, or wantonness.

In his opposition to Ford's motion for summary judgment, Easterling asserts that Phillips is not the only expert who has opined that the subject buckle was defective, and argues that the "unchallenged testimony and opinions" of Eric Van

Iderstine "established the existence of a defect with specificity …." (Doc. 85 at 19).  The court disagrees, for two reasons.

First, Van Iderstine was asked at his deposition whether he intended to offer "definitive opinions of defect in this case" or was "deferring to Mr. Phillips on ultimate opinions as they relate to an alleged defective condition of the buckle[.]" (Deposition of Eric Van Iderstine at 84).[12]  Van Iderstine responded that he had been retained "to conduct the CTs [of the buckle] and to perform testing" and that Phillips would be addressing "the defective – the condition, the – how that relates to the incident and alternative designs." (*Id.*)  He also confirmed that he did not hold any opinions on whether the plastic button return springs should have been made of a different material and had not done any work to determine the "root cause" of the fracture of the springs. (*Id.* at 108, 133).  Based on this testimony, the court finds that Van Iderstine was not retained to offer, and did not intend to offer, any product defect opinions in this case.  It would be prejudicial to Ford to allow Easterling to recharacterize Van Iderstine's opinions as "defect" opinions after Ford has moved for summary judgment.

---

[12] The Deposition of Eric Van Iderstine is located at Doc. 84-5.

Second, Van Iderstine's opinions would be inadmissible if construed and offered as opinions on the defective nature of the subject buckle.[13]  Consistent with his deposition testimony, Van Iderstine's expert reports addressed his CT scans of the buckle and the tests he performed to assess the impact of a partially depressed release button on the buckle's performance, but did not address how the buckle's condition related to the underlying incident.  Although Van Iderstine determined that the buckle's release button return springs were fractured, that the fractured springs were not capable of fully returning the button to its home position, and that a partially depressed release button can result in the unintended release of the latch plate, he did not analyze what caused the return springs to fracture in the first place.  He testified that the "cracked, broken" return springs rendered the buckle in a "compromised condition," but he offered no testimony or opinion that the buckle was in a "compromised condition" when it left Ford's control. (Van Iderstine Dep. at 82).  And unlike Phillips, he expressed no opinion on whether the button return springs should have been made of a material other than plastic.  Accordingly, to the extent Easterling has offered Van Iderstine's opinions as evidence that the subject buckle was defective, the opinions are unreliable and inadmissible just like

---

[13] In its motion to exclude Phillips's opinions, Ford expressly argued that "[t]o the extent … Van Iderstine attempts to offer opinions regarding product defect or why the subject buckle allegedly unlatched during the crash sequence, any such opinions should be excluded for the same reasons as Phillips.' " (Doc. 41 at n.6).

Phillips's opinions, and are insufficient to satisfy Easterling's burden of establishing product defect.

## 2. Breach of Implied Warranty

Easterling's breach of implied warranty claim fails for the same reason as his tort claims. To recover for breach of implied warranty under Alabama law, Easterling must prove "the existence of an implied warranty, breach of that warranty, and damages proximately resulting from that breach." *Bagley v. Mazda Motor Corp.*, 864 So. 2d 301, 315 (Ala. 2003) (quoting *Barrington Corp. v. Patrick Lumber Co.*, 447 So. 2d 785, 787 (Ala. Civ. App. 1984)). In addition, as with his tort claims, Easterling must prove that a defect in his seat belt buckle caused his injuries. *See Haven Hills*, 395 So. 2d at 996 (quoting *Shramek v. General Motors Corp.*, 216 N.E. 2d 244, 247 (Ill. App. Ct. 1966)) ("Whether the charge is breach of implied warranty, negligence, or the strict tort liability … the cornerstone of plaintiff's cause of action is the existence of a defect in the [product] at the time it left the control of the manufacturer or seller. Without this proof his case must fail."). Even Easterling tacitly admits that he must establish product defect in order for his warranty claim to survive summary judgment; he argues that his warranty claim is due to survive "*if* the Court finds that [he] has established a defect and proven causation by substantial evidence[.]" (Doc. 85 at 33) (emphasis added). As discussed above, the court has determined that

Easterling has not presented substantial evidence of product defect, because the court has excluded Phillips' expert opinions. Without Phillips' expert testimony to establish product defect, Easterling's breach of implied warranty claim fails just like his tort claims.

## C.     Failure to Warn

Easterling's complaint does not contain an express claim for failure to warn. However, both parties have construed the complaint as containing such a claim, although it is not clear to the court whether the claim is predicated on the AEMLD or on Easterling's negligence and wantonness allegations. (*See* Doc. 39 at 20-22; Doc. 85 at 33-35; Doc. 87 at 8-10). Regardless, the parties appear to be in agreement on the elements Easterling must establish in order to prevail on a failure-to-warn claim. They disagree on whether Easterling can establish those elements.

To prevail on a failure-to-warn claim under Alabama law, a plaintiff must establish "(1) that the defendant had a duty; (2) that the defendant failed to provide adequate warnings of the hazards of a particular product, thereby breaching that duty; (3) that the breach was the proximate cause of the plaintiff's harm; [and] (4) that the plaintiff suffered harm as a result." *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 518 (11th Cir. 2007) (discussing negligent failure to warn). To establish the defendant's duty to warn, the plaintiff must prove that "(1) the

defendant placed the product in question on the market, (2) the product was substantially unaltered when the plaintiff used it, (3) the product was imminently dangerous when put to its intended or customary purpose, and (4) the defendant knew or should have known that the product could create a danger when used in its intended or customary manner." *Campbell v. Robert Bosch Power Tool Corp.*, 795 F. Supp. 1093, 1097 (M.D. Ala. 1992) (discussing failure to warn under the AEMLD); *see Bean v. BIC Corp.*, 597 So. 2d 1350, 1353 (Ala. 1992) ("The manufacturer of a product which may be reasonably anticipated to be dangerous if used in a way which [it] should reasonably foresee it would be used is under a duty to exercise reasonable care to give reasonable and adequate warnings of any dangers known to [it], or which in the exercise of reasonable care [it] should have known and which the user of the product obviously could not discover.").

Here, the crux of Easterling's failure-to warn claim is that Ford "had a reason to know that the [RNS4G] buckle creates a danger when a consumer inserts the latch as intended" but "issued no warnings of any kind[.]" (Doc. 85 at 34). Easterling argues that Ford should have issued a recall or warning regarding the "pushbutton-related faults" that allegedly continued after Ford recalled a predecessor design of the RNS4G buckle in 2001. (*Id.*) Ford contends that it is entitled to summary judgment on this claim because Easterling has not provided substantial evidence that Ford had a duty to warn about the alleged hazard or that

Ford knew or should have known of problems with false latches of the RNS4G buckle due to fractured button return springs. (Doc. 87 at 8-10). Again, the court agrees with Ford.

As the court has noted throughout this opinion, Easterling's core allegation in this case is that his seat belt buckle unlatched during the crash of his vehicle because the buckle's plastic button return springs fractured at some point during the ten-year period after the vehicle was sold and failed to provide adequate force to return the button to its home position, which allowed for the inadvertent release of the latch plate when he crashed the vehicle. In other words, the buckle was not "substantially unaltered" when Easterling used it on the day of the crash; rather, it had a fractured component part. Because the buckle's "imminently dangerous" condition resulted from an alteration of the product, Easterling cannot establish that Ford had a duty to warn him about the danger. *See Campbell*, 795 F. Supp. at 1097.

As concerns Easterling's reliance on Ford's 2001 recall of a predecessor design of the RNS4G buckle and Ford's knowledge of "pushbutton-related faults" that continued after the recall, Easterling concedes that (1) his buckle was not part of the 2001 recall, (2) the 2001 recall did not involve fractured button return springs, and (3) the post-recall "faults" involved contamination within the buckle. (*See* Doc. 84 at 7-8 ("[T]here is no clear indication that this [recall] problem was

occurring due to fractured button return springs … and it is agreed that the buckle at issue was not one subject to the recall."); Doc. 85 at 17 ("There is clearly evidence … that the problem of a non-returning button and unintended unlatching continued into the design period past the Ford RNS4G recall, and that Ford continued to investigate those problems, which [it] eventually attributed to 'contamination' and 'sticky, gooey' substances. … [T]here is substantial evidence that the button return fault [in Easterling's buckle] is attributed directly to the defective, broken springs—and there is certainly no evidence of 'sticky, gooey' contamination in the subject buckle.")).  None of the evidence related to the 2001 recall and any post-recall issues would have put Ford on notice of problems associated with fractured button return springs so as to trigger a duty to warn. Accordingly, Easterling's failure-to-warn claim fails as a matter of law, whether the claim is predicated on the AEMLD, negligence, or wantonness.[14]

## CONCLUSION

Based on the above, Ford's motion to exclude the opinions of Donald R. Phillips (doc. 40) is due to be **GRANTED**; Ford's motion to strike Phillips's "newly disclosed" expert opinion and related testing (doc. 89) is due to be

---

[14] Easterling's wantonness claim also fails for the additional reason that Easterling has not presented any substantial evidence that Ford, "with reckless indifference to the consequences, consciously did some wrongful act or omitted some known duty with knowledge of the existing conditions, and that this act or omission" caused his injury. *Joseph v. Staggs*, 519 So. 2d 952, 954 (Ala. 1988); ALA. CODE § 12-21-12(a).  Wantonness demands proof of "some degree of conscious culpability," and Easterling has not met this standard. *George v. Champion Ins. Co.*, 591 So. 2d 852, 854 (Ala. 1991) (citation omitted).

**GRANTED**; and Ford's motion for summary judgment (doc. 38) is due to be

**GRANTED** in its entirety.  A separate order consistent with this opinion will be

entered.

      **DATED**, this 29th day of March, 2018.


_____
**JOHN E. OTT**
Chief United States Magistrate Judge